1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9    Joe Clarence Smith,                    )    No. CV-12-00318-PHX-PGR
                                            )
10                Petitioner,                )    <u>DEATH PENALTY CASE</u>
                                            )
11   vs.                                    )
                                            )
12                                          )    **ORDER**
     Charles L. Ryan, et al.,               )
13                                          )
                  Respondents.              )
14                                          )
                                            )
15   _____)

16           Before the Court is Petitioner's Motion for Evidentiary Development. (Doc. 42.)

17   Petitioner, a state prisoner under sentence of death, seeks discovery, expansion of the record,

18   and an evidentiary hearing in support of a number of claims contained in his petition for writ

19   of habeas corpus. (Doc. 25.) As explained below, to a large extent the Court's analysis of the

20   requested evidentiary development entails a consideration of the merits of the underlying

21   habeas claims. Accordingly, the following order addresses both the motion for evidentiary

22   development and the petition. For the reasons set forth herein, the Court denies the bulk of

23   Petitioner's requests for evidentiary development and denies habeas relief.

24                              <u>**BACKGROUND**</u>

25           A number of courts have had the opportunity to address the details of Petitioner's

26   crimes in the nearly four decades since they were committed. The following information is

27   taken from the Arizona Supreme Court's opinion upholding Petitioner's death sentences

28   following his second resentencing, *State v. Smith (Smith IV)*, 215 Ariz. 221, 159 P.3d 531

     (2007), and from this Court's review of the record from those proceedings.

On January 1, 1976, the nude body of Sandy Spencer, age 18, was found in the desert northwest of Phoenix. Her nose and mouth had been stuffed with dirt and taped shut, causing asphyxiation. Ligature marks on her wrists and ankles indicated that she had been bound before death and the ligatures had been removed after death. Before or near the time of death, Spencer also suffered 19 stab wounds to the pubic region and a vaginal tear caused by penetration. She also had three stab wounds to her breasts. A sewing needle, two and a quarter inches long, was embedded in her left breast.

On February 2, 1976, 14-year-old Neva Lee's naked body was discovered in the desert near the Salt River Indian Reservation. Like Spencer, Lee had died from "asphyxiation due to airway obstruction with soil." There were ligature marks on her wrists and ankles, the result of injuries suffered before death. She also had puncture and stab wounds to her chest, abdomen, and breasts, and damage to her vulva.

In November 1976, a Maricopa County grand jury indicted Petitioner for two counts of first-degree murder. The superior court severed the counts, requiring separate trials. A jury convicted Petitioner of first-degree murder on June 17, 1977, for the murder of Neva Lee. On July 7, 1977, Petitioner pleaded guilty to first-degree murder for the murder of Sandy Spencer. The superior court sentenced Petitioner to death on both counts. The Arizona Supreme Court affirmed the convictions, but remanded for resentencing in light of *State v. Watson*.[1] *State v. Smith (Smith I)*, 123 Ariz. 231, 243, 599 P.2d 187, 199 (1979).

At resentencing, Petitioner's counsel presented no new mitigation evidence and Petitioner was again sentenced to death. The sentences were affirmed on appeal. *State v. Smith (Smith II)*, 131 Ariz. 29, 35, 638 P.2d 696, 702 (1981).

---

[1] In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court held that limiting the evidence that could be presented in mitigation in capital cases violates the Eighth and Fourteenth Amendments. The Arizona Supreme Court subsequently held, in *State v. Watson*, 120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978), that A.R.S. § 13–454(F) unconstitutionally limited a defendant's ability to present mitigation evidence in a capital case. Petitioner's death sentence were vacated to allow him to present further mitigation evidence. *Smith I*, 123 Ariz. at 243, 599 P.2d at 199.

From 1984 through 1991, Petitioner filed a series of unsuccessful petitions for post-conviction relief ("PCR"). Petitioner subsequently filed a habeas corpus petition, which this Court denied. *Smith v. Stewart*, 91-CV-1577 (D. Ariz. Jan. 21, 1997).

On appeal, a divided panel of the Ninth Circuit held that Petitioner's counsel had been ineffective at the resentencing by failing to present new mitigating evidence and instead relying on the evidence submitted at the original sentencing. *Smith v. Stewart (Smith III)*, 189 F.3d 1004, 1014 (9th Cir. 1999). The majority cited, as potentially mitigating circumstances that were not presented at the second sentencing proceeding, evidence that Petitioner suffered from asthma, possessed multiple personalities and suffered from other mental disorders, had experienced a difficult family background, and maintained a good relationship with his girlfriend. *Id.* at 1009–10. The majority emphasized that "[t]estimony by a doctor that Smith lost contact with reality during his violent outbursts, which were themselves a result of psychological tension built up between the two sides of his split personality, could have led a judge to feel that he was not deserving of the ultimate punishment." *Id.* at 1014.

The resentencing proceeding for the murder of Sandy Spencer began before a jury in April 2004. In the aggravation phase, the State sought to prove the following aggravators: that Petitioner had a prior conviction for an offense punishable under Arizona law by a sentence of life in prison or death, pursuant to A.R.S. § 13–454(E)(1); that he had a prior felony conviction involving the use or threat of violence on another, under § 13–454(E)(2); and that the offense was committed in an especially heinous, cruel, or depraved manner, under § 13–454(E)(6).[2] In support of the (E)(1) aggravating factor, the jury heard testimony that Petitioner had previously been convicted of three counts of rape and sentenced to five years to life, 10 years to life, and 75 years to life. The State used Petitioner's conviction for

---

[2] At the time of Petitioner's offense in 1976, Arizona's capital sentencing scheme was set forth in A.R.S. § 13–454. At the time of Petitioner's resentencing in 2004, it had been amended and renumbered as A.R.S. § 13–703. It is presently set forth in A.R.S. § 13-751.

- 3 -

the murder of Lee to prove the (E)(2) aggravating factor. In support of the (E)(6) aggravator, the State offered testimony about the stab and puncture wounds to Spencer's body and her death by asphyxiation. The jury made separate findings that each aggravating factor had been proved beyond a reasonable doubt. With respect to the (E)(6) factor, the jury made additional findings that each prong—cruelty, heinousness, and depravity—had been proved.

In the penalty phase, the defense presented testimony from a neuropsychologist, Dr. Susan Parrish. She testified that Petitioner suffered from moderate brain impairment, anxiety, and dissociative disorder, conditions likely caused by his severe childhood asthma and related factors. She also diagnosed Petitioner as a sexual sadist, as did the State's expert. According to Dr. Parrish, the murders were a consequence of these conditions.

In addition to this expert mental health evidence, defense counsel presented lay testimony from a witness who observed Petitioner's "split personalities," as well as evidence concerning Petitioner's behavior while in prison, his family background, and his relationship with his mother and sister. The jury determined that Petitioner should be sentenced to death for the murder of Spencer.

The resentencing proceeding for the murder of Neva Lee began on May 5, 2004, before a new jury. The State again sought to prove the (E)(1), (E)(2), and (E)(6) aggravators. Testimony related to the three prior rape convictions and the Spencer murder was offered to prove the (E)(1) and (E)(2) aggravators, respectively. The State also offered testimony about the injuries to Lee and her cause of death to support the (E)(6) aggravator. The jury made separate findings that all three aggravators had been proved beyond a reasonable doubt, including each prong of (E)(6). The mitigation and rebuttal evidence in the penalty phase was substantially the same as in the Spencer proceeding. This jury also determined that Petitioner should be sentenced to death. The superior court sentenced Petitioner to death on both counts.

Petitioner appealed. Appellate counsel filed a 106-page opening brief raising six substantive issues and summarily raising 12 additional issues to avoid federal habeas

preclusion. (Doc. 30, Ex. A.) The Arizona Supreme Court affirmed Smith's death sentences. *Smith IV*, 215 Ariz. 221, 159 P.3d 531.

Petitioner sought post-conviction relief, raising three claims: (1) a Confrontation Clause violation regarding the testimony of the medical examiner, Dr. Phillip Keen, in both the Lee and Spencer resentencings, together with a claim of ineffective assistance of appellate counsel in not raising the claim on appeal; (2) prosecutorial misconduct in both the Lee and Spencer resentencing closing arguments, and a claim of ineffective assistance of appellate counsel for failing to raise the issue; and (3) newly-discovered mitigating evidence indicating that Petitioner had organic brain damage. (*Id.*, Ex. B.)

The state PCR court denied relief. (*Id.*, Ex. C.) It found that the allegations in Claim 1 were precluded as adjudicated on appeal and not colorable. (*Id.* at 2–3.) On Claim 2 the court found Petitioner had not presented a colorable claim of ineffective assistance of appellate counsel. (*Id.* at 3–4.) The court determined that any misconduct in the closing arguments was harmless. (*Id.* at 4.) With respect to Claim 3 the court found that the newly-presented evidence did not constitute "newly discovered material facts" pursuant to Rule 32.1(e) of the Arizona Rules of Criminal Procedure, and also found that the new evidence was "cumulative" to evidence that had been presented at resentencing. (*Id.* at 5–6.) Petitioner's petition for review to the Arizona Supreme Court was summarily denied on February 15, 2012. (Doc. 30, Ex's D, E.)

On December 21, 2012, Petitioner filed the instant petition for writ of habeas corpus, raising 39 claims for relief. (Doc. 25.) He filed his motion for evidentiary development on June 19, 2013.

## DISCUSSION

The Court will first address the claims for which Petitioner seeks evidentiary development. The Court will then address the claims Petitioner exhausted in state court. Finally, the Court will consider Claim 39, alleging ineffective assistance of counsel at resentencing for failing to present mitigating evidence of brain damage.

## I.     EVIDENTIARY DEVELOPMENT & *MARTINEZ*

Petitioner seeks expansion of the record under Rule 7 of the Rules Governing Section 2254 Cases with evidence demonstrating that appellate and post-conviction counsel rendered ineffective assistance. (Doc. 42 at 26–35.) These materials consist of correspondence from Petitioner's trial counsel, Dawn Sinclair, to post-conviction counsel, Michael Dew (Doc. 42-1, Ex. B); Mr. Dew's billing records (*id.*, Ex. C); the billing records of Petitioner's post-conviction mitigation specialist (*id.*, Ex. D); a declaration from trial counsel Sinclair (*id.*, Ex. E); and a declaration from Dr. Joseph Wu, an expert retained by Dew who performed a PET scan of Petitioner's brain (*id.*, Ex. F). Respondents oppose expansion of the record to include these materials. Petitioner also seeks, and Respondents oppose, an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 cases.

Petitioner has raised a series of habeas claims that were never presented in state court. The claims are procedurally defaulted.[3] Petitioner asserts, however, that pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), his default of the claims is excused by the ineffective assistance of his post-conviction counsel. To support this argument Petitioner seeks to expand the record to include, for example, correspondence from trial counsel Sinclair to post-conviction counsel Dew to show that the latter was aware of various allegations of ineffectiveness of appellate counsel.

The Ninth Circuit has summarized the holding in *Martinez* as follows:

a petitioner may establish cause for procedural default of a trial [ineffective assistance of counsel] claim, where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) "counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v.*

---

[3] "A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court." *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (en banc). An unexhausted claim will be procedurally defaulted if state procedural rules would now bar the petitioner from bringing the claim in state court. *See Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002).

1    *Washington*, 466 U.S. 668 (1984)," and (2) "the underlying ineffective-
2    assistance-of-trial-counsel claim is a substantial one, which is to say that the
     prisoner must demonstrate that the claim has some merit."

3    *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318).

4        The Ninth Circuit recently extended the holding in *Martinez* to apply to procedurally

5    defaulted claims of ineffective assistance of appellate counsel. *Ha Van Nguyen v. Curry*, 736

6    F.3d 1287, 1294–95 (9th Cir. 2013).

7        In order to determine whether post-conviction counsel's performance excused the

8    procedural default of Petitioner's claims of ineffective assistance of appellate counsel, the

9    Court must determine whether those claims are substantial or have some merit. *See Sexton*

10   *v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) ("To establish that PCR counsel was

11   ineffective, Sexton must show that trial counsel was likewise ineffective. . . .").

12       Ineffective assistance of appellate counsel claims are evaluated under the standard set

13   forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Moormann v. Ryan*, 628 F.3d 1102,

14   1106 (9th Cir. 2010) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). First, the petitioner

15   must show that counsel's performance was objectively unreasonable, which in the appellate

16   context requires the petitioner to demonstrate that counsel acted unreasonably in failing to

17   discover and brief a merit-worthy issue. *Id.* Second, the petitioner must show prejudice,

18   which in this context means that he must demonstrate a reasonable probability that, but for

19   appellate counsel's failure to raise the issue, he would have prevailed in his appeal. *Id.*

20

21       As discussed below, Petitioner cannot demonstrate that his claims of ineffective

22   assistance of appellate counsel are substantial because the claims appellate counsel failed to

23   raise were without merit. Appellate counsel therefore did not perform incompetently by

24   failing to raise the claims, and Petitioner suffered no prejudice from counsel's performance.

25   *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (finding no prejudice when

26   appellate counsel fails to raise an issue on direct appeal that is not grounds for reversal);

27   *Miller v. Kenney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (explaining that appellate counsel

28   remains above an objective standard of competence and does not cause prejudice when he

declines to raise a weak issue on appeal); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

The Court notes that it has reviewed the materials with which Petitioner seeks to expand the record and determined that their contents do not affect the Court's analysis of Petitioner's habeas claims. The materials are relevant, with the exception of Claim 39, only to the performance prong of Petitioner's claims of ineffective assistance of appellate and post-conviction counsel.[4] As detailed below, the Court has determined that Petitioner was not prejudiced by appellate counsel's performance. Petitioner's attempts to excuse the default of these claims under *Martinez* fail because the underlying ineffectiveness claims are not substantial. Because the claims are both defaulted and meritless, expansion of the record will be denied.

For the same reason, Petitioner is not entitled to an evidentiary hearing. Having reviewed the entire record, including the evidence presented by Petitioner in the PCR proceedings and in his motion to expand the record, the Court concludes that an evidentiary hearing is not warranted. *See* Rule 8(a) of the Rules Governing Section 2254 Cases. Whether Petitioner's allegations of ineffective assistance of trial and appellate counsel are "substantial" under *Martinez* is resolvable on the record. *Cf. Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (explaining that "a district court *may take evidence to the extent necessary* to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*") (emphasis added).

**Claims 1 and 2**

In Claim 1 Petitioner alleges that during the Spencer resentencing he was denied his

_____

[4] Trial counsel Sinclair's letters and affidavit discuss the issues she believed should have been raised by appellate counsel, express concerns over appellate counsel's failure to raise the issues or make effective arguments, and describe PCR counsel Dew's failure to visit her office to review the record. (Doc. 42-1, Ex's B and E.) Dr. Wu attests that he performed a PET scan on Petitioner, revealing brain abnormalities, and that such scans were widely used at the time of the resentencing proceedings. (*Id.*, Ex. F.)

1   right to a fair trial, an impartial jury, and reliable sentencing proceedings when the trial court

2   failed to remove an "automatic death penalty" juror from the venire.[5] (Doc. 25 at 14–18.) In

3   Claim 2 Petitioner alleges that appellate counsel rendered ineffective assistance by failing

4   to raise this claim. (*Id.* at 18–19.)

5        Respondents do not allege that Claim 1 was defaulted. Instead, they argue that the trial

6   court did not unreasonably apply clearly established federal law when it denied defense

7   counsel's challenge for cause.[6] (Doc. 30 at 25.) Petitioner contends that the Court must

8   review the claim *de novo*. (Doc. 44 at 6.) Under either standard of review, Petitioner is not

9   entitled to habeas relief.

10       The Constitution requires that a defendant be tried by a fair and impartial jury

11   comprised of members who will not automatically vote for the death penalty and will fairly

12   consider the evidence offered in mitigation. *Morgan v. Illinois*, 504 U.S. 719 (1992). Federal

13   habeas relief may be granted based on a state court's failure to strike a juror for cause only

14   where there is no fair support in the record for the court's determination that the juror was

15   unbiased. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). A state court's determination of

16   juror impartiality is entitled to a presumption of correctness on federal habeas review. *Id.* at

17   429; *see Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate

18   because it is in a position to assess the demeanor of the venire, and of the individuals who

19   compose it, a factor of critical importance in assessing the attitude and qualifications of

20   potential jurors.").

21

22       Juror 31B was one of a group of jurors who responded in the affirmative when asked

23   if they had the same concerns as another prospective juror who stated that he would

24   _____

25   [5] In his reply to the Respondents' answer to his motion for evidentiary development,
    Petitioner clarifies that only one of the prospective jurors cited in his habeas petition—Juror

26   31B—served on the jury that sentenced him to death. (Doc. 44 at 7.)

27   [6] As discussed below, under 28 U.S.C. § 2254(d)(1), a petitioner is entitled to habeas

28   relief on claims adjudicated on the merits in state court only where the state court's decision
    was contrary to, or involved an unreasonable application of, clearly established federal law.

automatically vote for the death penalty for a serial killer. (RT 3/30/04 at 167.)[7] The court followed up by asking whether the prospective jurors would "be able to listen to the mitigation, and if the mitigation was sufficiently substantial in your mind, individually vote for leniency." (*Id.* at 168.) Juror 31B responded, "Yes." (*Id.*) She subsequently indicated that she would be open to considering mitigating circumstances when deciding on a penalty. (RT 3/31/04 at 15.)

Defense counsel move to strike Juror31B for cause. (*Id.* at 113.) The court denied the motion, noting that the juror had also stated "that she wanted to hear all the evidence before she would make any decision, which to the Court means that she would follow her duties and responsibilities." (*Id.* at 115.)

The trial court correctly determined that Juror 31B was not an "automatic death juror." The record clearly supports the court's finding that the juror would not automatically vote for the death penalty and categorically reject any mitigating evidence offered by Petitioner. Therefore, the trial court did not violate Petitioner's rights under *Morgan* by denying his motion to strike the juror for cause.

Appellate counsel did not perform ineffectively by failing to raise this issue because it was without merit. Because there is no sufficiently substantial claim involved, the default of the claims is not excused under *Martinez*. Claims 1 and 2 are denied.

**Claim 3**

Petitioner alleges that he was denied effective assistance of counsel when, "during the 38 days in 2002 in which the State of Arizona did not have a death penalty, his attorneys failed to invoke his right to immediate sentencing under the Sixth Amendment, which would have entitled him to a life sentence for the murders." (Doc. 25 at 19.) The claim was not presented in state court, but Respondents have not asserted a defense of procedural default.

On June 24, 2002, the United States Supreme Court held that Arizona's death penalty

---

[7] "RT" refers to court reporter's transcript.

statute violated the Sixth Amendment because it allowed a judge, rather than a jury, to find the facts making a defendant eligible for the death penalty. *Ring v. Arizona*, 536 U.S. 584 (2002). According to Petitioner, therefore, from June 24, 2002, until August 1, 2002, when the legislature enacted new legislation, Arizona was without a valid death penalty statute, so if "Petitioner's trial counsel invoked his right to immediate sentencing at any time during that 38-day period, the court would have had no option but to sentence Petitioner to life sentences." (Doc. 25 at 21.)

Respondents contend that Petitioner cannot show prejudice from counsel's performance under *Strickland* and *Lockhart v. Fretwell*, 506 U.S. 364 (1993). (Doc. 32–35.) The Court agrees that Petitioner has not met his burden of showing prejudice.

Petitioner's claim of ineffective assistance is premised on the assertion that Arizona had no death penalty during the period in question and that he had a right to "immediate sentencing," which, if asserted, automatically would have entitled him to a life sentence. Nothing cited by Petitioner supports these premises. Petitioner refers to *State v. Nicholas Sizemore*, S-0900-CR-20010338 (Navajo County), indicating that the case involved a defendant facing a possible death sentence who "invoked [his] right to immediate sentencing and was accordingly sentenced to life." (Doc. 25 at 21.) However, Petitioner does not specify the legal basis for the superior court's ruling, provide copies of any unpublished orders from the case, or explain how the case supports his argument that if, between June 24 and August 1, 2002, he had moved to be re-sentenced on his 1977 first-degree murder convictions, the court "would have had no option but to sentence Petitioner to life sentences." (*Id.*)

Even if Petitioner had provided any support for his argument that he was entitled to a life sentence during the 38-day window, the Court concludes that he was not prejudiced by counsel's performance. In this case a focus on "mere outcome determination" is inappropriate, because counsel's performance did not render "the result of the proceeding . . . fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369–70 (1993) ("To set aside a conviction or sentence solely because the outcome would have been different but

for counsel's error may grant the defendant a windfall to which the law does not entitle him."). Instead, the consequence of counsel's failure to move for immediate sentencing was that Petitioner was properly re-sentenced after a jury trial, as required by *Ring*. Claim 3 is denied.

**Claims 5 and 6**

In Claim 5 Petitioner alleges that he was re-sentenced while legally incompetent. (Doc. 25 at 32.) In Claim 6 he alleges that resentencing counsel rendered ineffective assistance by failing to ask the court to determine Petitioner's competency. Neither claim was presented in state court. Petitioner contends that the default of Claim 6 is excused by the ineffective assistance of PCR counsel.

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The test for competence is "whether a criminal defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)).

A petitioner in a habeas proceeding who claims that he was incompetent at the time of trial must first come forward with "meaningful evidence" of mental incompetency. *See Demosthenes v. Baal*, 495 U.S. 731 (1990). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence" are relevant considerations. *Drope*, 420 U.S. at 180. A conclusory allegation of mental illness without more is not substantial evidence sufficient to raise a reasonable doubt concerning competency to stand trial. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).

In support of Claims 5 and 6, Petitioner's counsel assert that:

Upon information and belief, Petitioner was rendered legally incompetent by a dissociative disorder that prevented him from consulting with and meaningfully assisting the attorneys appointed to represent him during his re-sentencing proceedings. Because of this dissociative disorder, undersigned counsel have a good faith reason to believe that Petitioner may have lacked a

- 12 -

"rational as well as factual understanding of the proceedings against him."
(Doc. 25 at 33–34.) These conclusory statements do not constitute substantial evidence of incompetence.

There is no record of irrational behavior and all previous psychological reports found Petitioner competent to stand trial. Dr. Parrish, who was retained by sentencing counsel, diagnosed Petitioner with dissociative disorder. As was clear from her testimony, however, the disorder manifested itself during moments of crisis and extreme stress, causing a "deterioration in [Petitioner's] function" (RT 4/14/04 at 42) and overriding the controls on his behavior (5/204/04 at 30). Thus, the dissociative identity disorder was in effect when Petitioner was committing rape and murder. Nowhere does Dr. Parrish suggest that the disorder had any bearing Petitioner's competence during his resentencing proceedings 28 years later.

Counsel did not perform ineffectively by failing to seek a competency determination at resentencing. PCR counsel did not perform ineffectively by failing to raise this insubstantial claim. Claims 5 and 6 are denied.

**Claims 7, 8, and 9**

Claims 7 through 9 allege constitutional violations arising from the testimony of the judge who presided over Petitioner's murder trials and sentenced him to death. Claim 7 alleges that the testimony violated Petitioner's right to due process, an impartial jury, and freedom from arbitrary and capricious imposition of the death penalty. (Doc. 25 at 37–43.) Claim 8 alleges ineffective assistance of trial counsel based on the failure of Petitioner's attorneys to object to the testimony. (*Id.* at 43–45.) Claim 9 alleges ineffective assistance of appellate counsel. (*Id.* at 45–46.)

The prosecution called retired Arizona Supreme Court Justice Robert Corcoran to testify during the Spencer resentencing. (RT 4/20/04 at 48.) Petitioner did not object. (*Id.*) Justice Corcoran, who as a superior court judge had presided over Petitioner's trials for the Lee and Spencer murders and accepted Petitioner's guilty plea in the Spencer case, testified

- 13 -

generally about the procedures involved when a defendant pleads guilty. (*Id.* at 51–52.) With respect to the Spencer case, Justice Corcoran testified that, after having a colloquy with Petitioner and obtaining an adequate factual basis, he accepted Petitioner's guilty plea. (*Id.* at 54–56.) Justice Corcoran further testified that Petitioner subsequently moved to withdraw his guilty plea, but Corcoran denied the motion. (*Id.* at 56–57.)

On cross-examination, Petitioner's counsel asked Justice Corcoran about Petitioner's statements regarding the facts of the murder. (*Id.* at 57–60.) On re-direct examination, Corcoran testified that, although pleading defendants often attempt to "minimize their own involvement," Petitioner never told the court that he did not remember what happened on the night of the Spencer murder. (*Id.* at 62.)

Petitioner contends that Justice Corcoran's testimony was inappropriate under Rule 605 of the Arizona Rules of Evidence, which provides that "[t]he judge presiding at trial may not testify as a witness at the trial. (Doc. 25 at 41.) Justice Corcoran was not the judge presiding over Petitioner's resentencing proceedings, so Rule 605 was not violated.

Petitioner further argues that the testimony was unfairly prejudicial under Rule 403 in that it "effectively took from the jurors their personal responsibility for Petitioner's death sentence" because Justice Corcoran "had already made that decision for them years before." (Doc. 25 at 40.) According to Petitioner, the testimony violated his due process rights. The Court disagrees.

The due process inquiry on federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005); *see Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (explaining that to violate the federal constitution, the admission of evidence must "so fatally infect[ ] the proceedings as to render them fundamentally unfair."). The Supreme Court has emphasized that "it is not the province of a federal habeas court to reexamine state-

court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010).

In *Romano*, the Supreme Court held that the admission of evidence during the sentencing phase of a capital trial indicating that a different jury had sentenced the defendant to death in an earlier case did not impermissibly undermine the jury's sense of responsibility for determining whether the death penalty should be imposed. 512 U.S. at 9–10. The Court explained that the jury was not "affirmatively misled regarding its role in the sentencing process," and concluded that the evidence of a prior death sentence was not misleading because it was neither false at the time it was admitted, nor did it pertain to the jury's role in the sentencing process. *Id.* The Court also noted that the trial judge's instructions emphasized the importance of the jury's role. *Id.* at 9.

Justice Corcoran's testimony did not address the death sentence he imposed for the Spencer murder, so it did not relieve the jurors of their burden in choosing which penalty to impose at resentencing. Instead, the jurors were instructed that it was their decision whether death was the appropriate punishment. (RT 4/21/04 at 169–70.)

Trial counsel did not perform ineffectively by failing to object to Justice Corcoran's testimony because such objections would have been overruled. Appellate counsel did not perform ineffectively because the underlying issue was without merit. *See Moormann*, 628 F.3d at 1106. Because there is no sufficiently substantial claim involved, the default of these claims is not excused under *Martinez*. Claim 7, 8, and 9 are denied.

**Claims 10, 11, and 12**

Claims 10, 11, and 12 arise from the admission of allegedly improper opinion testimony during the Lee resentencing. Detective Rufino Dominguez investigated the scene where Lee's body was found and was present at her autopsy. He testified that there were ligature markings on Lee's ankles and wrists and that the footprints at the scene indicated a

- 15 -

1    struggle had taken place. (RT 5/17/04 at 53–54.) The testimony supported the cruel, heinous,

2    or depraved aggravating factor.

3        In Claim 10 Petitioner contends that this testimony was inadmissible under Rule 702

4    of the Arizona Rules of Evidence because there was no indication that Detective Dominguez

5    had specialized training or knowledge qualifying him to offer expert opinions, and that

6    admission of the testimony violated Petitioner's due process and fair trial rights. (Doc. 25 at

7    47–49.) Claims 11 and 12 allege ineffective assistance of trial and appellate counsel. (*Id.* at

8    49–50; Doc. 44 at 32–34.)

9        To be entitled to habeas relief Petitioner must show that the admission of Detective

10   Dominquez's testimony was not merely erroneous under state law but resulted in the

11   violation of a federal right. *See Wilson*, 131 S. Ct. at 16. He has not made that showing.

12       As an initial matter, the Court finds that admission of the testimony did not violate

13   Rule 702. Under Rule 702, a witness may qualify as an expert based on his "knowledge, skill

14   experience, training, or education." An expert witness is "one who possesses skill and

15   knowledge superior to than of men in general." *State v. Graham*, 135 Ariz. 209, 212, 660

16   P.2d 460, 463 (1983) (quotation omitted). Detective Dominguez had been with the homicide

17   unit for 17 years, and he had viewed ligature marks on other bodies. (RT 5/17/04 at 44–45,

18   53.) His knowledge and experience as a homicide detective qualified him to testify about the

19   ligature marks and footprints. *See Graham*, 135 Ariz. at 212, 660 P.2d at 463.

20

21       More significantly, Petitioner cannot show that admission of such evidence was

22   fundamentally unfair and resulted in prejudice. Detective Dominguez's opinions were

23   cumulative to other evidence. Autopsy and crime scene photographs were admitted into

24   evidence, and Dr. Keen, a medical examiner, testified that the photos showed ligature injuries

25   to Lee's wrists. (RT 5/17/04 at 115–16.) Detective Dominguez's testimony therefore did not

26   have a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S.

27   619, 637 (1993). The Arizona Supreme Court also reached this conclusion in rejecting

28   Petitioner's Confrontation Clause challenge to Dominguez's testimony:

- 16 -

1
2
3
4
5
6
7

   Even without the detective's contested testimony, the jury still heard evidence that Lee suffered stab and puncture wounds to her chest, breasts, and abdomen; puncture wounds and bleeding were observed around her vulva; none of the wounds would have been fatal; she died from "asphyxiation due to airway obstruction with soil"; she had ligature marks on her wrists and ankles; there were struggle areas found at the scene; the stab wounds occurred around the time of death; the ligature marks were made before death; and a person could be conscious from forty-five seconds to several minutes while being asphyxiated. Thus, Detective Dominguez's testimony added very little to the evidence the jury already had before it to find that the murder of Lee was especially cruel, heinous, or depraved. Therefore, even if the admission of this testimony was erroneous, the error was harmless beyond a reasonable doubt.

8

*Smith IV*, 215 Ariz. at 230, 159 P.3d at 540.

9
10

   Petitioner cannot show that any error from admitting Detective Dominguez's opinions was prejudicial under *Brecht*. Claim 10 is denied.

11
12
13
14
15
16
17

   Trial counsel did not perform ineffectively by failing to object to Detective Dominguez's testimony because such objections would have been overruled. Claim 11 is therefore meritless and will be denied. Appellate counsel did not perform ineffectively because the underlying issue was without merit. *See Moormann*, 628 F.3d at 1106. Because there is no sufficiently substantial claim involved, default of the claims is not excused under *Martinez*. Claim 12 is denied.

18

   **Claims 16 and 17**

19
20
21
22
23

   In Claim 16 of his habeas petition, Petitioner alleges that his rights to counsel, to a reliable sentence, and to due process were violated when the trial court instructed the jury to consider a statutory mitigating factor, despite defense counsel's objection. (Doc. 25 at 73–77.) In Claim 17 Petitioner alleges that appellate counsel rendered ineffective assistance by failing to raise the claim on appeal. (*Id.* at 77–79.)

24
25
26

   At the close of evidence in the Spencer and Lee resentencings, the trial court instructed the jury on the statutory mitigating factor of "significant impairment" as set forth A.R.S. § 13–751(G)(1).[8] (RT 4/21/04 at 164; RT 5/27/04 at 8.) Defense counsel objected,

27
28

   [8] A.R.S. § 13–751(G) provides:

arguing that the (G)(1) factor represented a "straw horse" for the prosecution to attack and diminished the value of the other, non-statutory mitigating evidence concerning Petitioner's mental health. (*See* RT 4/21/04 at 123; RT 5/26/04 at 146.)

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Petitioner contends that the trial court violated *Lockett*, and violated his right to counsel, because defense counsel did not proffer, and in fact objected to, the statutory mitigating factor of significant impairment. (Doc. 25 at 74.)

Petitioner's challenge to the significant impairment instruction as given by the trial court is clearly without merit. In *Boyde v. California*, 494 U.S. 370, 380 (1990), the Supreme Court instructed that the "proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." There is no such reasonable probability here, given the context of the jury instructions as a whole. *See Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973); *Boyde*, 494 U.S. at 383.

In both resentencing proceedings, jurors heard several days of testimony concerning Petitioner's mental condition and its effect on the crimes. In addition, defense counsel questioned the expert witnesses about Petitioner's ability to conform his conduct to the

---

The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

requirements of the law. In cross-examining the state's expert witness, Dr. Moran, counsel asked whether Petitioner's mental disorder "contributed to him having a less well-established capacity to control his behaviors." (RT 4/19/04 at 42.) Dr. Moran responded, "Yes." (*Id.*) Counsel also elicited responses from Dr. Moran to the effect that Petitioner's disorder overrode "his ability to choose the right thing to do." (*Id.*) Dr. Parrish likewise testified that Petitioner's mental disorder caused "diminished control" and "overrode the other controls that he had on his behavior." (RT 5/24/04 at 30.)

The trial court gave the following jury instruction concerning mitigating circumstances:

> Mitigating circumstances are circumstances that do not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability and punishment. Mitigating factors may be any factors presented by the defendant or the State that are relevant in determining whether to impose a sentence of less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense. During this penalty phase you have heard evidence presented regarding the following:

> The defendant's mental state at the time of the offense.

> The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

> Difficult family background.

> Good family and interpersonal relationships and impact of execution on family.

> Good conduct in prison.

(RT 4/21/04 at 168–69.) Nothing in the instruction prevented the jury from giving effect to all of the mitigating evidence it heard.

Petitioner contends that by instructing the jury specifically on the significant impairment mitigating circumstance, the court imposed a higher burden on the jury's consideration of mental health mitigating evidence in general. As the Supreme Court noted in *Boyde*, however, "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in

interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." 494 U.S. at 381. A jury provided with the instructions excerpted above, and having heard the extensive mental health evidence presented at trial, would apply a commonsense understanding of all the mitigating evidence rather than engaging in hairsplitting over the significant impairment factor.

Because Petitioner cannot show that there was a "reasonable likelihood" that the jury applied the instruction in a way that prevented consideration of mitigating evidence, *Boyde*, 494 U.S. at 380, the allegations in Claim 16 are without merit. Because Claim 16 is without merit, appellate counsel's failure to raise the issue does not constitute ineffective assistance of counsel. *See Moormann*, 628 F.3d at 1106. Because the allegation of appellate counsel ineffectiveness is plainly without merit and therefore not a "substantial" claim, Petitioner's default of the claim is not excused by post-conviction counsel's failure to raise the claim. *Martinez*, 132 S. Ct. at 1318

Claims 16 and 17 are denied as procedurally defaulted and meritless.

**Claims 18, 19, and 20**

During deliberations at the Spencer resentencing, the jury sent a question to the court: "If the jury does not come to a unanimous decision, with [sic] happens? Does the case get retried?" (RT 4/22/04 at 67.) The court was unable to contact defense counsel. (*Id.* at 66.) After 30 minutes, the court decided to answer the question as follows: "This issue is not relevant for deliberations. Please follow the instructions. What happens in the future is not be [sic] considered in your deliberations." (*Id.* at 67.) The court told Petitioner, who was present, that it would notify his lawyer. (*Id.*) The jury returned its verdict the next day. (RT 4/23/04 at 4.)

In Claim 18 Petitioner alleges that he was denied his right to counsel at a critical stage of the proceedings in violation of *United States v. Cronic*, 466 U.S. 648 (1984). (Doc. 25 at 79–82.) Claims 19 and 20 allege ineffective assistance of trial and appellate counsel. (*Id.* at

82–86.) These claims are without merit.

There is no Supreme Court authority establishing that a judge's communication with a jury during deliberations constitutes a "critical stage." *Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009). The Ninth Circuit has rejected the argument that "answering a jury question or request without first consulting defendant's counsel is structural error always requiring reversal." *United States v. Mohsen*, 587 F.3d 1028, 1031 (9th Cir. 2009). Instead, harmless error review applies. *See United States v. Rosales–Rodriguez*, 289 F.3d 1106, 1110 (9th Cir. 2002) (applying harmless error analysis to a trial judge's *ex parte* unsolicited note to the jury with a supplemental instruction regarding the substitution of an alternate juror); *United States v. Barragan–Devis*, 133 F.3d 1287, 1289 (9th Cir. 1998) (applying harmless error analysis to trial judge's lack of response to a jury note); *United States v. Frazin*, 780 F.2d 1461, 1469 (9th Cir. 1986) (applying harmless error where trial judge responded to a note indicating the jury was deadlocked with an *ex parte* instruction to continue deliberations).

In *Musladin*, the Ninth Circuit held that the state court was not unreasonable in finding that the court's communication to the jury, in which the judge responded to a question about the meaning of "express malice" by referring the jury back to the original instruction, was not a "critical stage" under *Cronic.* 555 F.3d at 842–43. Because the state court's decision not to apply *Cronic* was not objectively unreasonable, habeas relief could be granted only if the denial of counsel was prejudicial. *Id.* at 843. In assessing the reasonableness of the state court's decision, the Ninth Circuit noted that "where the judge simply directs the jury to his previous instructions the potential impact of defense counsel's inability to participate is significantly lessened. . . ." *Id.*

In applying the harmless error test, the Ninth Circuit in *Frazin* identified three relevant factors: the probable effect of the message actually sent, the likelihood that the court would have sent a different message had it consulted with defense counsel beforehand, and whether any changes in the message that appellants might have obtained would have affected the verdict in any way. 780 F.2d at 1470–71. Based on these factors it is clear that Petitioner was

not harmed by the court's response to the jury question notwithstanding defense counsel's absence. The jury asked whether Petitioner would be retried if it could not reach a unanimous verdict. The court responded that the question was not relevant to the jury's deliberations, and referred the jurors back to the instructions. Petitioner does not suggest that defense counsel, if present, could have offered a different response to the question, let alone a response that would have affected the verdict.

Petitioner was not prejudiced when the trial judge answered the jury question in counsel's absence. Claims 18 and 19 are therefore without merit and will be denied. Petitioner is not entitled to habeas relief on Claim 20, alleging ineffective assistance of appellate counsel, because the underlying claim is meritless. *See Moormann*, 628 F.3d at 1106.

**Claims 21 and 22**

In Claim 21 Petitioner alleges that there was insufficient evidence to support the finding of cruelty as an aggravating factor during the re-sentencing proceedings. Specifically, Petitioner argues that there was insufficient evidence that the victims were conscious prior to their asphyxiation. (Doc. 25 at 86–90.) In Claim 22 Petitioner alleges that appellate counsel rendered ineffective assistance in failing to raise this claim. (*Id.* at 90–91.)

Notwithstanding appellate counsel's failure to raise the claim, the Arizona Supreme Court, in its independent review of Petitioner's death sentence, considered and rejected the argument that the cruelty factor had not been proved:

> The "cruelty" prong of the (E)(6) aggravator focuses on the victim's mental anguish and physical suffering. A finding of cruelty requires proof that the victim "consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur."

> Spencer and Lee both died of asphyxiation after having their noses and mouths filled with dirt and taped shut. They also had marks on their wrists and ankles from ligatures that had been placed before death. Although the medical examiner could not conclusively establish consciousness before they had been bound, the tape and ligatures would have been unnecessary if the victims were unconscious. Asphyxiation caused by stuffing a victim's nose and mouth with dirt while bound would undoubtedly cause mental anguish and physical pain. At a minimum, Smith should have known pain and anguish would occur.

1
2
3

> Proof of cruelty is sufficient to establish the (E)(6) aggravator because the aggravator is stated in the disjunctive. Because we independently conclude that the murders of Spencer and Lee were cruel, we need not consider the separate findings of heinousness and depravity.

4

*Smith*, 215 Ariz. at 234–35, 159 P.3d at 544–45 (citations omitted).

5
6
7

Petitioner was not prejudiced by appellate counsel's failure to present this issue because the Arizona Supreme Court would have rejected the claim if it had been raised. Therefore, Claim 22 is without merit, and Petitioner is not entitled to habeas relief.

8
9
10
11
12
13
14
15
16
17

Likewise, Petitioner is not entitled to relief on Claim 21. The Arizona State Supreme Court's finding that the murders were especially cruel was not "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see Styers v. Schriro*, 547 F.3d 1026, 1033 (9th Cir. 2008). "A state court's finding of an aggravating circumstance in a particular case—including a de novo finding by an appellate court that a particular offense is 'especially heinous . . . or depraved'—is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783 (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)). A rational factfinder could have found that the victims were conscious and experienced mental and physical pain at the time of their murders.

18

Claims 21 and 22 are denied.

19

**Claims 24 and 25**

20
21
22

In Claim 24 Petitioner alleges several instances of prosecutorial misconduct. (Doc. 25 at 100–11.) Claim 25 alleges that appellate counsel rendered ineffective assistance by failing to raise these claims on direct appeal. (*Id.* at 111–12.)

23
24
25
26
27

Petitioner contends that the prosecutor committed misconduct during his cross-examination of one of Petitioner's witnesses; by vouching for the medical examiner; and by various comments made during his opening statements and closing arguments, including comments about the burden of proof. None of the alleged instances of misconduct entitles Petitioner to habeas relief.

28

"A prosecutor's actions constitute misconduct if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The "appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). "On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood*, 693 F.3d at 1113 (quoting *Brecht*, 507 U.S. at 637–38).

Cross-examination

Petitioner alleges that the prosecutor improperly cross-examined a defense witness. (Doc. 25 at 101–02.) During the mitigation phase of the Spencer resentencing, the defense offered the testimony of James Aiken, a corrections expert who discussed Petitioner's disciplinary record as a death row prisoner, which Aiken characterized as minor. Aiken testified about a March 24, 1978, major violation received by Petitioner for possessing a toothbrush with a blade attached to it. (RT 4/21/04 at 23.) Aiken characterized the weapon as defensive, noting that it was discovered after Petitioner had been attacked by other inmates earlier that month. (*Id.* at 23–24.)

On cross-examination, Aiken acknowledged that he was unfamiliar with the facts of Petitioner's crimes. (*Id.* at 52.) The prosecutor proceeded to question Aiken about Petitioner's use of a knife in the prior rapes and in the Spencer and Lee murders. (*Id.* at 55–56.) Aiken testified that these details did not change his opinion that the weapon found in Petitioner's cell was defensive in nature. (*Id.* at 56.)

The prosecutor's question were well within the latitude allowed in cross examination. *See Wood*, 693 F.3d at 1114. The prosecutor did nor misstate or manipulate the evidence. *See Darden*, 477 U.S. at 182. There was no misconduct.

Next, Petitioner alleges that the prosecutor improperly vouched for the work of non-

testifying medical examiners. (Doc. 25 at 102.) Dr. Phillip Keen testified at the resentencing proceedings after reviewing the work of the medical examiners who performed the Spencer and Lee autopsies, Drs. Karnitschnig and Jarvis, respectively. The prosecutor asked Dr. Keen whether Drs. Karnitschnig and Jarvis were "qualified forensic pathologists." (RT 4/6/04 at 29.) Dr. Keen testified that they were "board certified and qualified and trained and functioned as good, competent pathologists." (*Id.*)

To prove a claim of improper vouching, Petitioner must show the prosecutor placed "the prestige of the government behind a witness through personal assurances of the witness's veracity." *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005). This colloquy with Dr. Keen about the professional qualifications of his colleagues did not constitute vouching.

Opening statement and closing argument

Petitioner next alleges that the prosecutor committed misconduct during the aggravation phase of the Spencer resentencing by making derogatory comments about the defense in closing argument. (Doc. 25 at 102–03.) In discussing the concept of reasonable doubt, the prosecutor stated that "[d]efense attorneys for many years make a career arguing reasonable doubt." (RT 4/6/04 at 118.) He then urged the jurors to read the definition of reasonable doubt provided in the court's instructions. (*Id.*) In his rebuttal argument the prosecutor commented, with respect to the issue of whether Spencer was conscious when she was killed, "I guess I am not trying to make light, I guess that the defense wants you to think that the defendant walked up to Sandy, and she passed out. I mean, isn't that what we need to have her, she just passed out?" (*Id.* at 129.)

These comments did not constitute misconduct. Prosecutors and defense lawyers are given "wide latitude" in closing arguments. *United States v. Sayetsitty,* 107 F.3d 1405, 1409 (9th Cir. 1997); *see United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000)

(citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). The prosecutor's comments about reasonable doubt did not amount to an *ad hominem* attack on defense counsel. *See Williams v. Borg*, 139 F.3d 737, 744–45 (9th Cir. 1998) (finding no misconduct when prosecutor referred to defense's closing argument as "trash"); *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) (finding that "the prosecutor's characterization of the defense's case as 'smoke and mirrors' was not misconduct"); *Runningeagle v. Ryan*, 686 F.3d 758, 781 (9th Cir. 2012) (finding no due process violation where comments merely characterized evidence).

Petitioner also cites the prosecutor's comment that, "We're not here to solve this crime. This was done by an independent jury" (RT 4/6/04 at 129), noting that, in fact, Petitioner pleaded guilty to the Spencer murder. (Doc. 25 at 110.) Petitioner does not indicate in what manner the prosecutor's misstatement about how the conviction was reached could be prejudicial in the context of an argument about the existence of aggravating factors. The Court finds the comment harmless.

Petitioner also alleges that the prosecutor engaged in misconduct in his opening statement during the penalty phase of the Spencer resentencing when he commented that a sentence of less than death would amount to a "free murder" for Petitioner. (Doc. 25 at 103.) The comment was made in the context of the prosecutor's preview of testimony from Department of Corrections witnesses, who would explain that Petitioner was already serving a life sentence for other crimes so that if a death sentence were not imposed Petitioner "would do the same time in the same place for the rest of his life, as if he had not murdered anyone." (RT 4/19/04, a.m., at 21.) Defense counsel did not object to the comment, but later cited it in their motion for a new trial. (ROA 991.)[9]

---

[9] "ROA" refers to the record on appeal from resentencing (CR-04-0208-AP). As is the general practice in this District, the original reporter's transcripts, the trial court's presentence report, and certified copies of the trial records were provided to this Court by the Arizona Supreme Court.  (*See* Doc. 39.)

1    Respondents contend that the comment was not prejudicial given the jury instructions
2    provided by the court. (Doc. 30 at 124.) At the close of evidence, the court instructed the jury
3    that what the lawyers say during their opening statements and closing arguments is "not the
4    law and the evidence." (RT 4/21/04 at 167.) The court also explained that Petitioner was
5    serving three consecutive life sentences for three rapes; that he was not eligible for release
6    until he had served 90 years in prison; that "[i]f the jury imposes a life sentence concerning
7    the murder of Sandy Spencer, then the Court will be required to sentence the defendant to
8    life in prison without eligibility for release under any circumstances until not less than 25
9    years has been served"; and that this information was not aggravating or mitigating but was
10   "being explained to you only to complete the information regarding the defendant's current
11   and future imprisonment." (*Id.* at 171.)

12       These instructions were sufficient to eliminate any potential prejudice from the
13   prosecutor's comment about a "free murder." In *Runningeagle*, the Ninth Circuit found no
14   due process violation from the prosecutor's statement that "[t]he evil is among us," because
15   "before opening statements and after the close of the trial, the court instructed the jurors that
16   what the attorneys said in opening was not evidence, that they should decide the case only
17   on the evidence, and that they should not be influenced by sympathy or prejudice." 686 F.3d
18   at 781. In *Darden*, during closing the prosecutor referred to the defendant as an "animal" and
19   said that he should not be allowed out of a cell unless he was on a leash and that he wished
20   he could see Darden "sitting here with no face, blown away by a shotgun." 477 U.S. at
21   181–83 nn.11 & 12. The Court found that these improper statements did not deprive Darden
22   of a fair trial, because of the substantial evidence against him and because the trial court
23   instructed the jury that the arguments made by counsel were not evidence. *Id.* at 181–83; *see*
24   *Donnelly*, 416 U.S. at 645 (holding that an improper statement by a prosecutor during closing
25   argument did not amount to a due process violation in part because the judge instructed the
26   jury that the remark was not evidence).

27       Petitioner argues that the prosecutor engaged in misconduct by urging the jurors to

revisit the photographs of the victims, by emphasizing Petitioner's lack of remorse, and by asking the jurors to put themselves in the victim Lee's place. (Doc. 25 at 108–10.) While the last of these was arguably improper argument, it does not entitle Petitioner to relief. In *Drayden v. White*, 232 F.3d 704, 712–14 (9th Cir. 2000), the prosecutor's closing argument featured a soliloquy delivered in the murder victim's persona. The court found that the performance, "as deplorable as it was," did not violate the defendant's due process rights given the trial court's instruction to the jury that statements by the attorneys are not evidence and that jurors must not be influenced by sympathy, passion, or prejudice. *Id.* at 713. The trial court here gave similar instructions. (RT 5/27/04 at 6.)

Petitioner makes other allegations of misconduct, including that the prosecutor improperly denigrated the defense, mischaracterized the evidence, and misstated the standard for consideration of Petitioner's mental health evidence. (*See* Doc. 25 at 104–06.) None of these merit relief. Prosecutors are allowed to strike "hard blows" based on reasonable inferences from the evidence, *Henderson*, 241 F.3d at 652, and any improper or erroneous statements by the prosecutor were corrected by the jury instructions.

Burden of proof

Petitioner contends that the prosecution committed misconduct during its closing argument in both the Spencer and Lee resentencings when he stated that the defendant had the "burden of showing mitigation sufficiently substantial to call for leniency." (RT 5/27/04 at 82; *see, e.g.*, RT 4/22/04 at 6, 7.) The trial court overruled defense objections to the statements. (*See* RT 4/22/04 at 32–33.)

Unlike his other allegations of prosecutorial misconduct, Petitioner raised this claim in his PCR petition, together with a claim of ineffective assistance of appellate counsel. (Doc. 30-2, Ex. B at 20.) The PCR court denied the ineffective assistance claim, finding that Petitioner was not prejudiced by counsel's failure to raise the misconduct claim because the prosecutor's misstatement of the law was harmless. (*Id.*, Ex. C at 4.) The PCR court noted that jurors are presumed to follow the court's instructions, which, in this case, did not place

- 28 -

the burden on the defendant to show the mitigating evidence was sufficiently substantial to call for lenience. (*Id.*) Instead, as the PCR court correctly noted, the trial court simply instructed the jurors make an individual determination as to the sufficiency of the mitigating evidence. (*Id.*)

The record shows that the trial court first instructed the jury that the defendant bore the burden of proving the existence of mitigating circumstances by a preponderance of the evidence. (*See* RT 4/21/04 at 167–68.) The court then explained:

> Although a final decision on a penalty of death or life in prison must be unanimous, the determination of what circumstances are mitigating and the weight to be given to the mitigating circumstances is for each of you to resolve individually, based upon all the evidence that has been presented in both the aggravation and penalty phases. You must individually determine the nature and extent of the mitigating circumstances. Then, in light of all the aggravating circumstances that have been proved to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence. You must not weigh each mitigating circumstance against each aggravating circumstance.

(*Id.* at 169–70.) As noted, the court also instructed the jury that the arguments of counsel are not the law. (*Id.* at 167.)

In denying defense counsel's objections to the prosecutor's statement concerning the burden of proof, the trial judge explained that, while he had removed such language from his instructions, he believed the prosecutor did not misstate the law by placing the burden on the defendant. (RT 4/22/04 at 32.)

As the PCR court noted, in 2005, after Petitioner's resentencing, the Arizona Supreme Court, in *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 471, 123 P.3d 662, 665 (2005), rejected the State's request that it approve an instruction placing on the defendant the burden of proving the mitigating evidence sufficiently substantial to call for lenience. The court clarified that there is no "affirmative duty on the defendant to prove that mitigation is sufficiently substantial to call for leniency." *Id.* The court further explained "that the determination whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing

decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist." *Id.* at 473, 123 P.3d at 667.

In reaching its conclusion that Petitioner was not prejudiced by the prosecutor's comments, the PCR court relied on *State v. Tucker*, 215 Ariz. 298, 316, 160 P.3d 177, 196 (2007), which held that the trial court did not commit structural or fundamental error when it instructed the jury during the penalty phase of a capital murder trial that the defendant had the burden to prove that the mitigation evidence was sufficiently substantial to call for leniency. The court explained that the instruction did not reduce the State's burden of proof or preclude the jurors from considering relevant mitigation evidence. *Id.*

The Court finds that Petitioner's rights were not violated by the prosecutor's comments about the burden of proof and that the state court's denial of this claim was not objectively unreasonable. The trial court properly instructed the jurors to "individually determine the nature and extent of the mitigating circumstances" and "individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence." (*See* RT 4/21/04 at 169–70.)

Summary

Finally, the Court concludes that the cumulative impact of each of the incidents of alleged prosecutorial misconduct did not violate Petitioner's right to a fair trial. "Even when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, '[t]he cumulative effect of multiple errors can violate due process.'" *Wood*, 693 F.3d at 1116 (quoting *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009)). Here, however, Petitioner's allegations of prosecutorial misconduct do not rise to the level of a due process violation even when considered in the aggregate.

In sum, the allegations of prosecutorial misconduct set forth in Claim 24 lack merit. Appellate counsel did not perform at a constitutionally ineffective level by failing to raise them. Claims 24 and 25 are therefore denied.

- 30 -

1        **Claim 26**

2            Petitioner alleges that his rights to a fair and impartial jury were violated by the jury's

3    consideration of extraneous evidence during deliberations. (Doc. 25 at 113–14.) He seeks

4    discovery and expansion of the record to include the transcript of the related hearing. (Doc.

5    42 at 24–46.) Respondents do not oppose expanding the record to include the transcript, and

6    the Court will grant the request. (Doc. 43 at 19.)

7            Petitioner did not raise this claim on appeal. However, Respondents do not assert that

8    the claim is procedurally defaulted and therefore waive the affirmative defense of procedural

9    default. *Franklin v. Johnson*, 290 F.3d 1223, 1229–32 (9th Cir. 2002).

10           On June 10, 2004, the trial court contacted counsel to inform them that the jury

11   commissioner's office had received a call about possible juror misconduct in the Lee

12   resentencing. (ROA 1083.) Petitioner filed a motion for a new trial, which included an

13   allegation of juror misconduct based on the above information. (*Id.*) The motion stated that

14   someone in the jury commissioner's office reported an anonymous call from an individual

15   whose spouse observed a juror discussing the case with a co-worker. (*Id.* at 2.) Counsel

16   indicated that he had identified the juror, Craig Abney, but not the co-worker and the witness

17   to the conversation, and asked for additional time to investigate the claim. (*Id.*)

18           On July 15, 2004, Petitioner supplemented his motion for new trial regarding the juror

19   misconduct allegation. (ROA 1085.) On September 10, 2004, the trial court held an

20   evidentiary hearing. Two of Abney's co-workers provided hearsay testimony that he had

21   spoken about the case at work. (*See* Doc. 42-1, Ex. A, transcript of 9/10/04 hearing.)

22   Specifically, they testified that Abney told a co-worker, during the jury selection phase of the

23   Lee trial, that he found some of the attorneys' questions "kind of stupid." (*Id.*) While the trial

24   was ongoing, a co-worker asked Abney if Petitioner was guilty and Abney responded in the

25   affirmative. After Abney was discharged, a co-worker asked him, "Did you fry the bastard?"

26   Abney replied, "Yes." (*Id.*)

27           In a minute entry following the hearing, the trial court assumed that Abney had made

28

1   the statements but found "no showing that these comments, made during jury selection, near
2   the end of the trial and after the trial concluded, either actually prejudiced the jury
3   proceedings against the defendant or were such that prejudice could fairly be presumed from
4   the facts." (Doc. 40-7 at 82.) Although Abney had "apparently violated the court's
5   admonition by commenting on the case during the ongoing trial," the court concluded that
6   "there is absolutely no evidence that he received or considered any extrinsic evidence, or that
7   his comments about the jury selection process and that the defendant was guilty in any way
8   tainted his conduct as a juror." (*Id.*)

9       Petitioner seeks to depose Abney and two of his co-workers who did not testify at the
10  evidentiary hearing in state court. (Doc. 42 at 25–26.) Respondents object to this discovery
11  on the grounds that the consideration of new evidence concerning this claim is barred under
12  *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). (Doc. 43 at 19–20.) The Court agrees.
13  Petitioner is not entitled additional discovery because his claim of jury misconduct was
14  adjudicated on the merits in state court. Under *Pinholster*, review of such claims "is limited
15  to the record that was before the state court that adjudicated the claim on the merits." *Id.* at
16  1388; *see, e.g.*, *Wood*, 693 F.3d at 1122.

17      Petitioner contends that he is entitled to discovery because he has demonstrated, under
18  28 U.S.C. § 2254(d)(1), that the state court's resolution of this claim was contrary to or an
19  unreasonable application of clearly established federal law. The Court disagrees. Petitioner
20  has not shown that there is "no reasonable basis" for the trial court's ruling, as required under
21  § 2254(d)(1). *Pinholster*, 131 S. Ct. at 1402; *see Harrington v. Richter*, 131 S. Ct. 770,
22  786–87 (2011) (explaining that "a state prisoner must show that the state court's ruling on
23  the claim being presented in federal court was so lacking in justification that there was an
24  error well understood and comprehended in existing law beyond any possibility for
25  fairminded disagreement").[10]

26

27  ─────────────

28      [10] In addition, Petitioner has not shown "good cause" for discovery, as required by
    Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts. He has

1    Petitioner identities no clearly established federal law holding that a defendant's right

2    to a fair and impartial jury is violated under the circumstances of this case, where a juror

3    disobeyed the admonition not to discuss the case but where there was no consideration of

4    extrinsic evidence or other misconduct. Petitioner fails to show that the state court erred, let

5    alone was objectively unreasonable, in its application of *Turner v. Louisiana*, 379 U.S. 466

6    (1965); *Remmer v. United States*, 347 U.S. 227 (1954); and *Mattox v. United States*, 146 U.S.

7    140 (1892). As the Ninth Circuit recently explained, in rejecting a habeas claim based on

8    juror misconduct, "The Supreme Court . . . has found juror misconduct to warrant reversal

9    in cases involving *extended* external influences on jurors or confirmed juror *bias*—neither

10   of which is present here." *Henry v. Ryan*, 720 F.3d 1073, 1086 (9th Cir. 2013).

11   Claim 26 is denied. Discovery is denied. The record will be expanded to include the

12   transcript of the September 10, 2004, hearing.

13   **Claim 27**

14   Petitioner alleges that he was denied his right to meaningful appellate review because

15   the record on appeal did not include the transcript from the juror misconduct hearing. (Doc.

16   25 at 115.) Petitioner argues that the lack of a transcript prevented effective appellate

17   advocacy and prevented the Arizona Supreme Court from conducting an adequate review of

18   his death sentences. The Court disagrees.

19

20   Petitioner has the burden of establishing prejudice from the lack of a complete

21   transcript in light of the alleged value of the transcript and the availability of alternatives that

22   would fulfill the same functions. *Madera v. Risley*, 885 F.2d 646, 648–49 (9th Cir. 1989);

23   *see United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994) (explaining that when court

24   reporter failed to record all proceedings verbatim, defendant had to demonstrate specific

25   prejudice resulted to obtain reversal); *White v. State of Florida, Department of Corrections,*

26   939 F.2d 912, 914 (11th Cir. 1991) ("in a federal habeas corpus case brought by a state

27

28   failed to offer specific allegations showing that, if the facts are fully developed regarding this
claim, he would be entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

1    prisoner, the absence of a perfect transcript does not violate due process absent a showing

2    of specific prejudice"); *Bransford v. Brown*, 806 F.2d 83, 85 (6th Cir. 1986) ("in order to

3    demonstrate denial of a fair appeal, petitioner must show prejudice resulting from the missing

4    transcripts").

5         Petitioner has failed to show any "specific prejudice" resulting from the omission of

6    records on appeal. First, the lack of transcript did not prevent appellate counsel from raising

7    the issue of juror misconduct. The record contained trial counsel's motion for a new trial and

8    the trial court's minute entry following the evidentiary hearing. Moreover, as discussed

9    above, in denying the motion for a new trial, the court accepted as true the testimony

10   presented in the hearing but found that Petitioner was not deprived of a fair trial. (Doc. 40-7

11   at 82, ME 9/10/04.) Finally, while the hearing has recently been transcribed (Doc. 42-1, Ex.

12   A), Petitioner does not contend that the transcript, had it been available, would have affected

13   the Arizona Supreme Court's review of Petitioner's death sentences.

14        Claim 27 is without merit and will be denied.

15        **Claim 28**

16        Petitioner alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by

17   failing to disclose information material to his resentencing proceedings. (Doc. 25 at 118.)

18   Petitioner never presented this claim to the state courts. He seeks to excuse his default of the

19   claim by alleging ineffective assistance of PCR counsel under *Martinez*. (*Id.* at 119.)

20   Petitioner acknowledges that he can offer no support for the allegations in Claim 28. (Doc.

21   44 at 99.) Because Petitioner has provided no support for either a *Brady* claim or a claim that

22   PCR performed ineffectively, *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995); *James v.*

23   *Borg*, 24 F.3d 20, 26 (9th Cir. 1994), Claim 28 is denied.

24

25        **Claim 31**

26        Petitioner alleges that the "numerous errors committed during [his] re-sentencing

27   proceedings cumulatively produced a proceeding that was fundamentally unfair and violated

28   his due process." (Doc. 25 at 126.) Petitioner asserts that his default of the claim is excused

by the ineffective performance of appellate and PCR counsel. (Doc. 44 at 104–05.)

Respondents contend that there is no clearly established federal law entitling a petitioner ro habeas relief under the doctrine of cumulative error. (Doc. 30 at 142.) Petitioner cites *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), in which the Ninth Circuit, quoting *Donnelly*, 416 U.S. at 643, held that cumulative error warrants habeas relief where the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

Petitioner is not entitled to relief on this claim because, as explained throughout this order, there were no constitutional errors affecting his due process rights. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). ("Because there is no single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation."); *cf. Parle*, 555 F.3d at 928 ("If the evidence of guilt is otherwise overwhelming, the errors are considered 'harmless' and the conviction will generally be affirmed.").

Because Petitioner's cumulative error claim is meritless, appellate counsel was not ineffective for failing to raise it and PCR counsel was not ineffective for failing to raise a claim of ineffectiveness of appellate counsel. Claim 31 is denied.

## II.    EXHAUSTED CLAIMS

These claims are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Thus, "a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, that application must be "objectively unreasonable." *Id.* at 409. This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam ). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 785–86.

**Claim 4**

Petitioner alleges that the trial court violated his right to a fair and impartial jury by improperly limiting the scope of *voir dire* and inappropriately rehabilitating prospective jurors. (Doc. 25 at 22.) Petitioner raised this claim on direct appeal, and the Arizona Supreme Court denied it. *Smith IV*, 215 Ariz. at 230–32, 159 P.3d at 540–42.

Background

Prior to the Spencer resentencing, the State filed a motion requesting the court to prohibit the defense from asking prospective jurors about specific types of mitigation or aggravation, while Petitioner moved for individual, sequestered *voir dire* and the opportunity for defense counsel "to examine potential jurors with sufficient latitude to satisfy constitutional requirements." (ROA 793, 802.) The trial court issued an order noting its responsibilities under *Morgan v. Illinois* and proposing to "thoroughly examine potential jurors" and allow the parties "reasonable time to conduct individual *voir dire* of potential jurors," as provided by Rule 18.5 of the Arizona Rules of Criminal Procedure. (ROA 865 at 1–2.) The court prohibited "questions of potential jurors that will elicit their views on specific types of aggravating or mitigating circumstances," and questions about case-specific information intended to "groom" or "condition" the potential jurors or commit them to taking

certain positions. (*Id.* at 2.) The court stated that it would "do all that is reasonable and appropriate to insure all concerned, that the jury selected will act fairly and impartially, follow the law and base their decisions solely on the evidence presented." (*Id.*)

The court also ruled, with respect to its use of a juror questionnaire, that the questions could not delve "into their feelings about specific aggravators and mitigators." (RT 3/18/04 at 134.) Petitioner objected, arguing that the questionnaire should include questions about specific mitigating evidence, particularly mental health evidence, rather than questions "in the abstract." (*Id.* at 134–38.) The court advised the parties that it was his "responsibility to see if the jury can fairly and impartially follow the law with obvious opportunity for you and the State to ask additional questions." (*Id.* at 142.) The court promised that "[w]e are going to do it right, no matter what it takes, one day or ten days." (*Id.* at 145.)

Prospective jurors filled out a 22-page questionnaire. As *voir dire* proceeded the court reiterated that the parties were not to ask about particular aggravating or mitigating circumstances. (RT 3/24/04 at 80–90. at 91.) When defense counsel requested more specificity about the proper scope of questioning, the court cited *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998), and advised counsel that it would interrupt if a party asked an inappropriate question, whether or not the opposing party had objected. (*Id.* at 93–95.) Petitioner submitted a list of proposed questions; the trial court found all but one to be improper. (RT 3/25/04 at 15–18.)

The court presided over the initial individual questioning of prospective jurors. (RT 3/25/04.) The next day, however, the court decided to proceed with group *voir dire*, rather than individual *voir dire*, unless the latter was necessitated by a potential juror's answers. (RT 3/26/04 at 3–4.) The court indicated that it was changing procedures to elicit more informative answers, not to save time. (*Id.* at 5–6, 8.) The court also stated that it would "do the bulk of *voir dire*." (*Id.* at 12.)

During *voir dire* the court explained the law concerning aggravation and mitigation, questioned the prospective jurors based on information from their questionnaire answers, and

allowed the parties to question the prospective jurors. Jury selection in the Spencer case lasted seven days. The Lee jury selection, following the same procedures, took six days.

Analysis

The Arizona Supreme Court first addressed Petitioner's claim that the trial court's limitations on the questioning of prospective jurors violated *Morgan v. Illinois*, 504 U.S. 719, which held that potential jurors must be asked whether they would automatically impose the death penalty if a defendant is found guilty. The court rejected Petitioner's claim:

> Although there is no "catechism for *voir dire*," the defendant's right to an impartial jury nonetheless requires "adequate *voir dire* to identify unqualified jurors." *Id.* at 729. The Court further held that simply asking potential jurors whether they can follow the law and be fair and impartial is insufficient. *Id.* at 735–36.
>
> *Morgan,* however, does not require that Smith be permitted to ask the questions that he claims were improperly limited. First, we have previously held that a trial court may prohibit a defendant from asking potential jurors about their understanding of the phrase "sufficiently substantial to call for leniency." Such questioning is not allowed because the phrase is necessarily subjective. *Id.* Moreover, the manner in which Smith's counsel posed the question improperly asked the potential jurors, without having heard any of the evidence, to opine on what it would take to meet that standard.
>
> Second, the superior court did not abuse its discretion in refusing to allow Smith's open-ended questions about the best reason for having or not having the death penalty, the importance of considering mitigation, and the type of offense for which the juror would consider death to be appropriate. Each of these questions was quite broad and went well beyond the constitutionally required determination of whether the juror would consider mitigation.
>
> Finally, Smith complains that he was not permitted to ask jurors whether they would automatically impose the death penalty if they found specific aggravators. *Morgan* was not meant to allow a defendant to "ask a juror to speculate or precommit on how that juror might vote based on any particular facts." *United States v. McVeigh,* 153 F.3d 1166, 1207 (10th Cir. 1998). Defendants also cannot seek to "condition" or "commit [jurors] to certain positions prior to receiving the evidence." Smith's question attempted to do just that. . . .
>
> In addition, *Morgan* does not, as Smith seems to contend, prohibit the trial court from asking jurors whether they will follow the law. As long as counsel has sufficient opportunity to determine whether a particular juror would automatically impose the death penalty upon a guilty verdict, such general questioning may occur without running afoul of the mandate of *Morgan.* 504 U.S. at 736. Smith had several opportunities to determine whether any of the jurors would automatically impose death. The jurors filled

1
2
3

out questionnaires, which contained the *Morgan* question, along with other questions about the death penalty, and Smith had ample opportunity to question potential jurors—including asking some jurors the very questions that he complains were limited.

4

*Smith IV*, 215 Ariz. at 230–32, 159 P.3d at 540–42 (citations omitted).

5
6
7
8
9
10
11
12
13
14
15
16
17

The court next considered and rejected Petitioner's claim that the trial judge "abused his discretion by interrupting *voir dire* and 'rehabilitating' potential jurors." *Id.* at 231, 159 P.3d at 541. The court noted that Petitioner "had multiple opportunities to question the potential jurors to determine whether they would automatically impose the death penalty" and that the "interruptions consisted almost entirely of explanations of the law and clarification of the questions being asked or answers being given." *Id.* Citing *Wainwright v. Witt*, 469 U.S. 412, 435 (1985), the court explained that "a judge may interject to make certain a juror understands the legal requirements for service, the law on a particular subject, and the question being asked"; therefore, the judge's "interjections were permissible and did not amount to an abuse of discretion." *Id.* Finally, the court found no abuse of discretion because "Smith fails to offer any examples of deliberating jurors whom the trial judge improperly rehabilitated to support his argument that automatic death jurors sat on either jury." *Id.* at 231–32, 159 P.3d 541–42.

18
19
20
21

Petitioner contends that the Arizona Supreme Court unreasonably applied *Morgan* by requiring him to identify a deliberating juror who was improperly rehabilitated by the judge. (Doc. 25 at 30; *see* Doc. 44 at 14–15.) The Court disagrees with this characterization of the Arizona Supreme Court's decision and its application of *Morgan*.

22
23
24
25
26
27

A defendant is entitled to "a fair trial by a panel of impartial, indifferent jurors," which, under *Morgan*, requires "an adequate *voir dire* to identify unqualified jurors," including those who would "impose death regardless of the facts and circumstances of the conviction." 504 U.S. at 727, 729, 736. "*If* even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.* at 729 (emphasis added).

28

- 39 -

The Arizona Supreme Court found that the trial court allowed adequate *voir dire* and that the limits placed on the questions Petitioner sought to ask did not prevent him from identifying so-called "automatic death jurors." The trial court used a juror questionnaire that contained the *Morgan* questions. The court questioned the jurors and allowed the parties to conduct additional *voir dire*. Petitioner contends that the court inappropriately rehabilitated prospective jurors. In rejecting this claim, the Arizona Supreme Court correctly noted that Petitioner has not identified any such jurors. *See Morgan*, 504 U.S. at 729; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) ("[a]ny claim that the jury was not impartial" rests "on the jurors who ultimately sat"); *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007).

The Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. 28 U.S.C. 2254(d); *see Richter*, 131 S. Ct. at 786–87. Petitioner is not entitled to habeas relief. Claim 4 is denied.

**Claim 13**

Petitioner alleges that he was denied his constitutional right to confront witnesses at the Lee resentencing when the court admitted (1) Dr. Keen's testimony about the condition of Lee's body and (2) Detective Dominguez's testimony about another police officer's report. (Doc. 25 at 51.) Petitioner raised this claim on direct appeal, and it was rejected by the Arizona Supreme Court. *Smith IV*, 215 Ariz. at 228–230, 159 P.3d at 538–40.

In his petition for post-conviction relief, Petitioner again raised a claim alleging that his Confrontation Clause rights were violated by Dr. Keen's testimony. (Doc. 30-2, Ex. B at 13–19.) The PCR court denied the claim. (*Id.*, Ex. C at 2–3.)

Background

The state offered the testimony of Dr. Keen and Detective Dominguez in support of the cruel, heinous, or depraved aggravating factor.

Prior to resentencing proceedings the parties were able to locate the full report of the Spencer autopsy, which was performed by Dr. Jarvis, but only the one-page cover sheet from

the Lee autopsy, performed by Dr. Karnitschnig. The remaining portion of the report, filled out according to a specific and detailed autopsy protocol, had been lost or destroyed. (RT 2/17/04 at 108.)

The State proposed calling Dr. Phillip Keen, the Chief Medical Examiner for Maricopa County, to testify in lieu of Drs. Jarvis and Karnitschnig.[11] Petitioner opposed the request. (ROA at 777). The trial court preliminarily ruled that Dr. Keen could testify about Dr. Karnitschnig's findings because they were offered to explain Dr. Keen's own findings and opinions, not to prove the truth of matters asserted by Dr. Karnitschnig. (ROA 865.)

Before the Lee resentencing began, Petitioner moved to preclude testimony from Dr. Keen and Detective Dominguez. The court ruled that Dr. Keen could testify about his own opinions, and, to the extent that he did so, could testify in reliance on Dr. Karnitschnig's findings and opinions. (ROA 1018.) The court rejected Petitioner's Confrontation Clause claim, based on *Crawford v. Washington*, 541 U.S. 36 (2004), finding the statements were non-hearsay. (*Id.* at 2.) The court also ruled that Detective Dominguez could testify about statements that Dr. Karnitschnig made during the Lee autopsy. (*Id.*) It found that Dr. Karnitschnig's statements themselves were admissible as a present sense impression under Rule 803(1) of the Arizona Rules of Evidence. (*Id.*)

Detective Dominguez testified about his own observations of Lee's body at the crime scene. (RT 5/17/04 at 45–52.) Lee was completely nude, and there were stab wounds in the abdominal area and ligature marks around the ankles and wrists. (*Id.* at 53-54, 78.) He

---

[11] The trial court took judicial notice that Dr. Jarvis was deceased. (RT 3/18/04 at 18.) In fact, Dr. Jarvis was still alive at the time of resentencing. The prosecutor informed the court that Dr. Karnitschnig had retired and was located outside of Maricopa County. (ROA 754 at 2.) Dr. Karnitschnig had testified at the original trial and sentencing. (RT 5/11/04 at 12–13.) The prosecutor conceded that the doctor was not legally unavailable, but explained that, based on the prosecutor's personal knowledge, the doctor was unlikely to honor a subpoena. (*Id.* at 15.)

1    testified that he and his partner, Detective Paul, attended the Lee autopsy on February 3,

2    1976. (*Id.* at 50, 55–58, 62, 76.) Detective Paul took notes. (*Id.* at 58.) As Dr. Karnitschnig

3    assessed the body, he commented on her injuries, including measurements, which Detective

4    Paul wrote down. (*Id.* at 59-60.) After Detective Paul prepared his report, Detective

5    Dominguez read it, found that it accurately reflected Dr. Karnitschnig's statements, adopted

6    it as his own, and signed it. (*Id.* at 62, 77–78; *see* ROA 1007, second attachment.) Detective

7    Dominguez testified that he independently remembered the various injuries described by Dr.

8    Karnitschnig and only relied on the written report for measurements of Lee's wounds. (*Id.*

9    at 61.)

10           Petitioner renewed his objections to the testimony. (*Id.* at 82–84.) The court overruled

11   the objections on the grounds that Detective Dominguez had "co-authored the report," and

12   thus had refreshed his memory with his own recorded recollection, and that Dr.

13   Karnitschnig's statements themselves were admissible as present sense impressions. (*Id.* at

14   89–91.)

15           Dr. Keen testified that he had reviewed autopsy and crime scene photographs and Dr.

16   Karnitschnig's testimony from prior proceedings, as well as the cover sheet of the missing

17   autopsy report, on the back of which Dr. Karnitschnig had written his summary findings from

18   the Lee autopsy. (RT 5/17/04 at 105.) Dr. Keen explained that these materials are "things that

19   are generally relied on upon by experts in [his] field to generate opinions." (*Id.* at 107.)

20           Dr. Keen further testified that he had independently verified the existence of the

21   wounds he observed in the photographs, relying on Dr. Karnitschnig's prior testimony for

22   measurements of the wounds, which typically are found in the autopsy report. (*Id.* at 109,

23   131.) Concurring with Dr. Karnitschnig's findings, Dr. Keen concluded that Lee died from

24   "asphyxiation due to airway constriction with soil," because none of her other injuries would

25   have resulted in death. (*Id.* at 112, 127, 128, 132–33, 137–38.) He testified that loss of

26   consciousness from suffocation can take from 45 seconds to several minutes. (*Id.* at 137.)

27           From his own review of the autopsy photographs, Dr. Keen concluded that Lee had

28

at least two "rather sizeable stab wounds in the upper gastric region of the abdomen." (*Id.* at 113.) The photographs also showed stabbing injuries around Lee's vulva. (*Id.* at 124–26.) Dr. Keen opined that the stab wounds and the suffocation occurred around the time of death. (*Id.* at 127, 135.) The photographs also showed ligature injuries to Lee's wrists. (*Id.* at 114–16.)

Petitioner moved to strike Dr. Keen's testimony in its entirety. (RT 5/17/04 at 142.) The trial court denied the motion, explaining that Dr. Keen had specifically differentiated "whether it was his independent opinion versus what it wasn't his opinion." (*Id.*) The court also ruled that Dr. Keen had reasonably relied on Dr. Karnitschnig's prior testimony, the police report, and the autopsy photographs. (*Id.*) The court agreed to give a cautionary instruction that had been requested by the defense. (*Id.* at 144–45, 150–51.)

After the State rested, Petitioner renewed his objections and moved to strike all of Detective Dominguez's testimony and part of Dr. Keen's testimony, with the exception of his testimony about Lee's chest wounds and the contusions on her wrists and ankles. (RT 5/18/04 at 10.) The trial court again denied the motions (*Id.* at 20–21.) However, the court gave the jury the following limiting instruction: "Dr. Phillip Keen has testified regarding his findings regarding certain wounds on Neva Lee's body and the cause of Neva Lee's death. The information relied upon by Dr. Keen is not evidence and you cannot consider it as such." (RT 5/18/04 at 29.)

Analysis: Detective Dominguez's testimony

The Arizona Supreme Court held that the testimony from Dr. Keen did not violate the Confrontation Clause and that the admission of testimony from Detective Dominquez, even if erroneous, was harmless.

With respect to Detective Dominguez's testimony, the court first noted that the police report and the statements made by the medical examiner during the autopsy both qualified as hearsay exceptions, the former as a recorded recollection under Rule 803(5) and the latter as a present sense impression under Rule 803(1). *Smith IV*, 215 Ariz. at 229, 159 P.3d at 539.

Turning to Petitioner's Confrontation Clause claim, the court reasoned that,

"[b]ecause . . . any potential error in admitting the testimony was harmless beyond a reasonable doubt, we need not decide whether admission of Detective Dominguez's statements violated the Confrontation Clause." *Id.* The court explained:

> Even without the detective's contested testimony, the jury still heard evidence that Lee suffered stab and puncture wounds to her chest, breasts, and abdomen; puncture wounds and bleeding were observed around her vulva; none of the wounds would have been fatal; she died from "asphyxiation due to airway obstruction with soil"; she had ligature marks on her wrists and ankles; there were struggle areas found at the scene; the stab wounds occurred around the time of death; the ligature marks were made before death; and a person could be conscious from forty-five seconds to several minutes while being asphyxiated. Thus, Detective Dominguez's testimony added very little to the evidence the jury already had before it to find that the murder of Lee was especially cruel, heinous, or depraved. Therefore, even if the admission of this testimony was erroneous, the error was harmless beyond a reasonable doubt.

*Id.* at 229–30, 159 P.3d at 539–40 (citations omitted).

The Arizona Supreme Court's ruling was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable application of the facts. A petitioner's claim that his confrontation rights were violated is subject to harmless error analysis. *See, e.g.*, *Bullcoming v. New Mexico*, 131 S. Ct. 2701, 2719 n.11 (2011); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be 'quantitatively assessed in the context of other evidence presented' to the jury."). Thus, Petitioner would be entitled to habeas relief only if the Confrontation Clause error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (explaining that on federal habeas review, courts must assess the prejudicial impact of constitutional error in a state court criminal trial under the *Brecht* standard).

Even without Detective Dominguez's testimony about the autopsy, there was sufficient evidence concerning the circumstances of Lee's death, particularly the nature of her wounds and the manner in which she was killed, as evidenced by the autopsy photographs and Dr. Keen's testimony, for the jury to find that the murder was committed

in an especially cruel, heinous, or depraved manner. Detective Dominguez's testimony relating statements made by Dr. Karnitschnig's during the autopsy did not have a substantial and injurious effect on the jury's verdict.

Analysis: Dr. Keen's testimony

The Arizona Supreme Court rejected Petitioner's claim that Dr. Keen's testimony was inadmissible hearsay and violated his right to confront the previous medical examiner. The court first explained that the testimony was admissible under Rule 703:

> Expert testimony that discusses reports and opinions of another is admissible under this rule if the expert reasonably relied on these matters in reaching his own conclusion. Such testimony is not hearsay because it is offered not to prove the truth of the prior reports or opinions, but rather is offered only to show the basis of the testifying expert's opinion. A testifying expert, however, may not act as a "conduit for another non-testifying expert's opinion." Smith contends, with respect to Dr. Keen's testimony on the cause of death, size of wounds, and timing of infliction, that Dr. Keen acted as a conduit for the prior medical examiner's opinion.
> . . .
>
> Thus, Dr. Keen was not a mere conduit for the opinions of the prior medical examiner; rather, his ultimate opinions were independent of the testimony of the prior medical examiner. Because the underlying data and opinions were used to show the basis for these conclusions, and not to prove the truth of the matters asserted, there was no hearsay problem.

*Smith IV*, 215 Ariz. at 228, 159 P.3d at 538. (citations omitted).

The court also concluded that because Dr. Keen's testimony was not used to prove the truth of the matter asserted, Petitioner's Confrontation Clause rights were not violated. *Id.* at 229, 159 P.3d at 539. In reaching this determination, the court cited *Crawford*, which held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 54.

Petitioner raised this claim again in his petition for post-conviction relief, citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), as a significant change in law.[12] (Doc.

---

[12] In *Melendez–Diaz*, the Supreme Court held that forensic laboratory certificates of analysis fell within the core class of testimonial statements covered by the Confrontation

30-2, Ex. B at 13.) The PCR court found the claim precluded because it had already been ruled on by the Arizona Supreme Court. The PCR court also found that, even if *Melendez-Diaz* did represent a significant change in the law, its holding was inapplicable to Petitioner's claim because Dr. Keen was not a "mere conduit" for the prior medical examiner's opinions. (*Id.*, Ex. C at 3.)[13]

Petitioner argues that the state courts unreasonably applied *Crawford* and *Melendez-Diaz* in denying this claim. The Court disagrees. There is no clearly established federal law addressing whether the evidence at issue here—the cover page of an autopsy report summarizing a medical examiner's findings—is testimonial in nature. As the First Circuit observed, in the wake of the rulings in *Melendez-Diaz* and *Bullcoming*,[14] "Even now, it is uncertain whether, under its primary purpose test, the Supreme Court would classify autopsy reports as testimonial." *Nardi v. Pope*, 662 F.3d 107, 112 (1st Cir. 2011). Courts have repeatedly identified "a split in circuit authority on the issue." *King v. Brazelton*, No. CV-13-1019-DSF (DFM), 2013 WL 6072019, at *8 (C.D.Cal. Nov. 18, 2013) ("Such a split further confirms the absence of any clearly established federal law that would render the California

Clause. 557 U.S. at 310.

[13] The PCR court cited *State v. Snelling*, 225 Ariz. 182, 236 P.3d 409, 414 (2010). In *Snelling*, the Arizona Supreme Court held that the testimony of a medical examiner was not hearsay, and thus, the admission of the testimony did not violate Snelling's confrontation rights. Although the appellate court recognized that the medical examiner relied on an autopsy report that she did not conduct or observe, the court determined that she was not a "conduit" merely for the admission of otherwise inadmissible hearsay evidence because she also studied crime scene photographs and used her own training to come to an independent conclusion.

[14] In *Bullcoming*, the Supreme Court held that the admission of a forensic lab report completed by a non-testifying analyst through the "surrogate testimony" of the analyst's colleague who neither performed nor observed the procedure violated the Confrontation Clause. 131 S. Ct. at 2715–16.

1   Supreme Court's adjudication objectively unreasonable."[15]); *see Kruger v. Katavich*, No. SA-
2   CV-12-1006-SVW (VBK), 2013 WL 2153954, at *6 (C.D.Cal. May 9, 2013) (finding the
3   state court's denial of *Crawford* claim was not an unreasonable application of clearly
4   established federal law because "no Supreme Court holding has identified an autopsy report
5   as a 'testimonial' statement").

6       Cases from the Ninth Circuit reinforce this Court's conclusion that the state courts did
7   not violate clearly established federal law in denying Petitioner's Confrontation Clause
8   claims. *See Flournoy v. Small*, 681 F.3d 1000 (9th Cir. 2012); *McNeiece v. Lattimore*, 501
9   Fed.Appx. 634 (9th Cir. 2012). In *Flournoy*, the Ninth Circuit considered a claim in which
10  a forensic analyst testified as an expert based on the work and conclusions of another analyst.
11  The testifying expert performed a technical review of the unavailable analyst's work and
12  gave an independent conclusion about the test results. 681 F.3d at 1002. Noting that
13  *Melendez Diaz* "held only that a lab report could not be admitted without a witness appearing
14  to testify in person," the Ninth Circuit proceeded to discuss the effect of the holding in
15  *Bullcomin*g. *Id.* at 1005. The court observed that:

16
17          Justice Sotomayor provided the decisive fifth vote for the majority in
            *Bullcoming*. In her separate opinion, she specifically identified Confrontation
18          Clause questions that in her view remained unanswered by the Court's
            holdings in that 2011 case, let alone by *Crawford*. These unresolved areas
19          included the treatment of experts testifying to their opinions based on reports
            not admitted into evidence, as well as the degree of proximity the testifying
20          witness must have to the scientific test. *See id.* at 2722 ("We would face a
            different question if asked to determine the constitutionality of allowing an
21          expert witness to discuss others' testimonial statements if the testimonial
            statements were not themselves admitted as evidence."); *id.* ("[T]his is not a
22          case in which the person testifying is a supervisor, reviewer, or someone else
            with a personal, albeit limited, connection to the scientific test at issue. . . . We
23          need not address what degree of involvement is sufficient. . . ."). Both of these
            open issues were relevant to Flournoy's case. If those areas remained unsolved
24          as of 2011, it is impossible to conclude that the California court's conclusions
            in this case were contrary to clearly established federal law at the time.
25

26       _____
27       [15] As examples of this split in circuit authority the court compared *United States v.
         Ignasiak*, 667 F.3d 1217, 1230–31 (11th Cir. 2012), holding that autopsy reports are
         testimonial, with *United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013), holding that an
28       autopsy report is not testimonial.

1   *Id.*

2        In this case, to the extent that any of the materials reviewed by Dr. Keen, including

3   the autopsy cover page, could properly be characterized as testimonial, they were not

4   admitted into evidence. Therefore, as explained in *Flournoy*, a determination that Dr. Keen's

5   testimony did not violate the Confrontation Clause was not an unreasonable application of

6   clearly established federal law.

7        In *McNeiece v. Lattimore*, the trial court admitted into evidence as a business record

8   excerpts of an autopsy report showing a diagram of the victim's body with descriptions of

9   the bullet wounds. 501 Fed.Appx. at 636. The Ninth Circuit found that the state appellate

10  court's determination that these excerpts were non-testimonial was not contrary to or an

11  unreasonable application of *Crawford*. *Id.* The trial court also allowed a pathologist who had

12  not conducted the autopsy to testify about the diagrams and to offer his opinions based on

13  the report and other evidence. Again, the Ninth Circuit held that the state court did not

14  unreasonably apply clearly established federal law when it determined that the testimony did

15  not violate the Confrontation Clause. *Id.* (citing *Flournoy*, 681 F.3d at 1004–05).

16       The Supreme Court's recent decision in *Williams v. Illinois*, 132 S. Ct. 2221 (2012),

17  is also instructive on the state of clearly established federal law. In *Williams*, the Court found

18  no violation of the Confrontation Clause when an expert in a rape case expressed an opinion

19  based on a DNA profile produced by an outside laboratory. The Court explained that when

20  such an expert testifies, "the defendant has the opportunity to cross-examine the expert about

21  any statements that are offered for their truth. Out-of-court statements that are related by the

22  expert solely for the purpose of explaining the assumptions on which that opinion rests are

23  not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* at

24  2228. As the Tenth Circuit commented in *United States v. Pablo*, 696 F.3d 1280, 1293 (10th

25  Cir. 2012), after *Williams*, "the manner in which, and degree to which, an expert may merely

26  rely upon, and reference during her in-court expert testimony, the out-of-court testimonial

27  conclusions in a lab report made by another person not called as a witness is a nuanced legal

- 48 -

1  issue without clearly established bright line parameters." *See also United States v. Gomez*,
2  725 F.3d 1121, 1129 (9th Cir. 2013); *Rodriguez v. Lewis*, No. CV-13-1075-CAS (OP),  2013
3  WL 1401215, at *27 (C.D.Cal. Dec. 26, 2013).

4      Accordingly, the state courts' adjudication of Petitioner's right of confrontation claim
5  concerning Dr. Keen's testimony was neither contrary to nor involved an unreasonable
6  application of clearly established federal law. *See Knowles v. Mirzayance,* 556 U.S. 111, 122
7  (2009) (holding that "it is not 'an unreasonable application of clearly established Federal
8  law' for a state court to decline to apply a specific legal rule that has not been squarely
9  established by this Court"); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of
10 holdings from this Court regarding" the claim, "it cannot be said that the state court
11 'unreasonabl[y] appli[ed] clearly established Federal law.'"); *Brewer v. Hall*, 378 F.3d 952,
12 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law
13 relating to the legal issue the habeas petitioner raised in state court, the state court's decision
14 cannot be contrary to or an unreasonable application of clearly established federal law."). For
15 this reason alone, Petitioner's claim does not warrant habeas relief.

16      Finally, even if Dr. Keen's testimony did violate Petitioner's right of confrontation,
17 Petitioner would not be entitled to habeas relief. As noted above, a Confrontation Clause
18 claim is subject to harmless error analysis. *See, e.g.*, *Bullcoming*, 131 S. Ct. at 2719 n.11; *Van*
19 *Arsdall*, 475 U.S. at 684; *Winzer*, 494 F.3d at 1201. Petitioner is entitled to habeas relief only
20 if the error had a substantial and injurious effect in determining the verdict. *Brecht*, 507 U.S.
21 at 637.

22      The State presented Dr. Keen's testimony to prove the cruel, heinous, or depraved
23 aggravating factor. The jury found that all three prongs had been proved.

24      As the record demonstrates and the Arizona Supreme Court found, "Dr. Keen formed
25 his own conclusions based on the partial autopsy report, photographs of Lee's body, and the
26 testimony of the prior medical examiner," and "independently concluded that the ligatures
27 were placed on the wrists and ankles before death, the cause of death was asphyxiation, and

the stab wounds were inflicted near the time of death." *Smith IV*, 215 Ariz. at 228, 159 P.3d at 538. Dr. Keen testified about Lee's stab wounds and ligature marks. His findings were arrived at independently—that is, not as a "mere conduit" for Dr. Karnitschnig's conclusions—and in reliance on information typically used by medical examiners to reach their opinions. Detective Dominguez also testified about his personal observations of the condition of Lee's body, which was documented in photographs provided to the jury. This evidence, by depicting "gratuitous violence" and "needless mutilation,[16] supported the jury's verdict that Petitioner committed the murder in an especially heinous or depraved manner, notwithstanding the timing of the wounds or the victim's consciousness. Therefore, even excluding any testimony in which Dr. Keen merely parroted Dr. Karnitschnig, there was sufficient evidence to support the (E)(6) aggravating factor. Any error was harmless.

For the reasons discussed, Claim 13 is denied.

**Claim 14**

Petitioner alleges ineffective assistance of counsel based on appellate counsel's failure to argue that Petitioner's Confrontation Clause rights were violated when Dr. Keen testified during the Spencer re-sentencing. (Doc. 25 at 65–68.) Dr. Keen's testimony and findings concerning Spencer's death paralleled those he offered with respect to Lee, with the significant difference that in the Spencer case Dr. Keen was able to review the full autopsy report prepared by Dr. Jarvis.

Petitioner raised this claim in his PCR petition. (Doc. 30-2, Ex. B at 18.) The court denied the claim. (*Id.*, Ex. C at 3.) It noted that the autopsy report was not admitted in

---

[16] The court instructed the jury: "A murder especially heinous if it is hatefully or shockingly and [sic] evil, that is grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion, or deterioration." (RT 5/18/04 at 34–35.) Heinousness and depravity are shown by "[i]nfliction of gratuitous violence on the victim; needless mutilation of the victim's body after death." (*Id.* at 35.) In determining whether the murder was heinous or depraved the jury could also consider whether the murder was senseless or the victim was helpless. (*Id.*)

1  evidence and that "Dr. Keen's ultimate opinions were independent of the testimony of the
2  prior medical examiner." (*Id.*) The court concluded that appellate counsel did not render
3  deficient performance by choosing "not to raise this meritless issue" and there was no
4  prejudice because "the Supreme Court would have rejected this issue as to the Spencer case
5  for the same reasons it rejected the issue in the Lee case." (*Id.*)

6  The PCR's court's ruling is neither contrary to nor an unreasonable application of
7  *Strickland*. As just discussed, the Arizona Supreme Court denied an identical Confrontation
8  Clause claim relating to testimony about the Lee autopsy. Appellate counsel's failure to raise
9  a weaker claim challenging testimony about the Spencer autopsy does not constitute
10  ineffective assistance. *See Miller v. Kenney*, 882 F.2d at 1434; *Jones v. Barnes*, 463 U.S. 745,
11  751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the
12  importance of winnowing out weaker arguments on appeal and focusing on one central issue
13  if possible, or at most on a few key issues."). Claim 14 is denied.

14  **Claim 15**

15  Petitioner alleges that his constitutional rights were violated when the state courts
16  allowed, pursuant to A.R.S. § 13-454(E)(2), one murder conviction to serve as an
17  aggravating factor in Petitioner's sentence for the other murder. (Doc. 25 at 69.) Petitioner
18  argues that first-degree murder does not by definition entail the use or threat of violence,
19  which is required for an offense to qualify as an aggravator under (E)(2).[17] (*Id.*)

20  
21  Petitioner raised this claim on appeal and the Arizona Supreme Court denied it. The
22  court first noted that "[a] prior felony conviction qualified as an aggravator under former
23  A.R.S. § 13–454(E)(2) only if the elements of the offense—without regard to the underlying
24  facts of the crime—required the use or threat of violence on another person." *Smith IV*, 215

25  ─────────────

26  [17] The legislature subsequently amended A.R.S. § 13–703(F)(2) (formerly A.R.S. §
27  13–454(E)(2)). The amended aggravator requires only that the prior conviction be for a
28  "serious offense." First-degree murder is expressly identified as such an offense, A.R.S. §
    13–703(I)(1).

Ariz. at 227, 159 P.3d at 537. The court focused, therefore, on the language of the statute, reasoning as follows:

> The statute in effect at the time of the murders defined first-degree murder as "murder . . . perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing." A.R.S. § 13–452. Smith contends that "under the statutory definition, first degree murder could be committed by lacing a victim's food or drink with poison. A murder committed in this manner would not involve the use or threat of violence." We reject this contention.
>
> Under A.R.S. § 13–454(E)(2), violence is defined as the use or threat of force with the intent to injure or abuse. We hold that even surreptitious poisoning involves the use of force. A person who uses poison to kill another person "intentionally avails herself of the physical force exerted by poison on a human body." Poison invades a victim's body, attacking vital organs, until it causes death. It is this result that an assailant seeks in choosing to poison his victim.
>
> First-degree murder, as defined in A.R.S § 13–452, therefore cannot be committed without the use of force, whether that force be exerted by the defendant or by some instrumentality that the defendant has put to this use. Accordingly, we affirm the trial court's denial of Smith's motion for a judgment of acquittal on the (E)(2) aggravator because a prior first-degree murder conviction does establish this aggravator.

*Id.* (citations omitted).

Petitioner claims that this decision was contrary to or an unreasonable application of clearly established federal and based on an unreasonable determination of the facts. (Doc. 25 at 69–70.) The Court disagrees.

The United States Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). A state court's finding of the existence of an aggravating factor is a question of state law. *Jeffers*, 497 U.S. at 780; *see Harris v. Vasquez*, 868 F.3d 1116, 1118–19 (9th Cir. 1989) (noting that whether a prior conviction qualifies for a sentence enhancement under California law is not a cognizable federal habeas claim); *see also Hawkins v. Mullin*, 291 F.3d 658, 662–63 (10th Cir. 2002) (explaining that habeas court is bound by state court's interpretation of its felony-murder statute).

Federal habeas review is limited to determining whether the state court's finding was

so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Jeffers*, 497 U.S. at 780. To assess the sufficiency of the evidence in support of the factor, a court applies the "rational factfinder" standard and asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist. *Id.* at 781 (quoting *Jackson*, 443 U.S. at 319).

The Arizona Supreme Court's interpretation of its own first-degree murder statute was not arbitrary or capricious. Defining first-degree murder as a crime of violence, necessarily involving force, did not violate Petitioner's due process or Eighth Amendment rights. The court's interpretation of the first degree murder statute did not, as Petitioner asserts, result in a failure to narrow the aggravating circumstances relied on by the State. A reasonable juror could have found that the (E)(6) aggravating factor had been proved.

Petitioner suggests ways that premeditated murder can be committed without the use of or threat of force—by starving an infant, for instance. (Doc. 25 at 71–72). The fact that Petitioner can imagine such scenarios does not lessen the binding nature of the Arizona Supreme Court's interpretation of Arizona law.

Claim 15 is denied.

**Claim 23**

Petitioner alleges that his due process and Eighth Amendment rights were violated by the admission of irrelevant and unduly prejudicial rebuttal evidence. (Doc. 25 at 92.) The Arizona Supreme Court rejected this claim on direct appeal. *Smith IV*, 215 Ariz. at 232–33, 159 P.3d at 542–43. Petitioner also argues that admission of the rebuttal testimony violated the *Ex Post Facto* Clause. (Doc. 25 at 95–100.)

Background

The trial court granted the State's motion to present evidence in rebuttal. (ROA 865 at 12.) The court stated that "both parties are entitled to present relevant information for and against the imposition of a mitigated sentence, including reliable hearsay, without violating the defendant's right to due process and confrontation." (*Id.* at 11.) The court noted,

1    however, that it would "carefully control the nature and scope of information allowed in

2    rebuttal." (*Id.* at 12.) The court also rejected Petitioner's argument that presentation of the

3    evidence would constitute an *ex post facto* violation. (*Id.*)

4         As discussed above, Petitioner presented mitigation regarding his mental health. Dr.

5    Parrish diagnosed Petitioner with moderate brain impairment, an anxiety disorder leading to

6    dissociative states, and sexual sadism. She testified that Petitioner was in a dissociative state

7    and acted out of impulse when he committed the murders. Dr. Parrish further testified that

8    Petitioner did not have an anti-social personality disorder, citing evidence that he was

9    capable of empathy as shown by the fact that he cared for animals and maintained a good

10   relationship with his mother.

11        Dr. Moran, the State's expert witness, also diagnosed Petitioner as a sexual sadist. He

12   disagreed, however, with Dr. Parrish's diagnosis of an anxiety disorder. In making their

13   diagnoses, both Dr. Moran and Dr. Parrish reviewed the underlying facts of Petitioner's

14   crimes.

15        In rebuttal at both resentencing proceedings, the State offered testimony concerning

16   the details of Petitioner's three prior rape conviction and his murder convictions. A detective

17   described the circumstances of Petitioner's first two rape convictions, which involved a

18   woman to whom he and his wife had offered a ride. Petitioner forcibly raped the victim

19   twice, once at Petitioner's house in his wife's presence, and again after having driven the

20   victim to the desert, raping her inside his car while his wife sat outside on the trunk. (RT

21   4/19/04 at 85–87; RT 5/25/04 at 88–90.) Petitioner repeatedly threatened to kill the victim

22   and spoke about bodies being found in the desert. (*Id.*) He released her, however, after she

23   promised to bring him money the following day. (*Id.* at 87.)

24

25        The victim from Petitioner's third rape conviction testified during the Spencer

26   sentencing. She testified that she was walking home when Petitioner stopped his car and

27   offered her a ride. (RT 4/20/04 at 32.) Instead of taking her home, Petitioner drove her to the

28   desert where he bound her hands, forced her to engage in intercourse, tried to strangle her,

raped her with a Pepsi bottle, forced her to give and receive oral sex, sodomized her, and forced her to urinate while he watched. (*Id.* at 33–38.) Brandishing a knife, he repeatedly threatened to kill her. He told her he was a "sadist," and asked her if she wanted pins or the knife stuck in her nipple. (*Id.* at 35, 39, 41.) Petitioner finally drove the victim back into town and released her. (*Id.* at 42–43.) She was 17 years old at the time of the attack, and four or five months pregnant. (*Id.* at 31–32.) She did not testify during the Lee sentencing.

At the close of evidence the trial court provided the following instruction with respect to the prosecution's rebuttal evidence:

> Pursuant to law, the State has presented evidence to rebut the defendant's mitigating evidence. This evidence is not a new aggravating circumstance. It is presented solely to give you a more complete picture of the defendant's character, propensities or record, and to aid you in determining whether the mitigation is sufficiently substantial to call for lenience and the imposition of a life sentence.

(RT 4/21/04 at 169; RT 5/27/04 at 9.)

<u>Analysis</u>

On direct appeal Petitioner argued that admission of the rebuttal evidence violated his due process and Eighth Amendment rights. The Arizona Supreme Court denied the claim. The court first cited A.R.S. § 13–703(C), under which the State and the defendant are permitted to produce any evidence at the penalty phase relevant to any of the mitigating circumstances, and A.R.S. § 13–703.01(G), which allows both parties to present evidence that is relevant to whether the mitigation presented is sufficiently substantial to call for leniency. *Smith IV*, 215 Ariz. at 232, 159 P.3d at 542. The court explained that:

> The superior court correctly determined that this testimony was relevant to the diagnosis of sexual sadism, which was the thrust of Smith's mitigation. Indeed, the mental health experts relied on the underlying facts of these crimes to diagnose Smith. This testimony thus assisted the jury in its evaluation of that testimony and in determining whether Smith's mental illness played a role in each murder.

*Id.*

The court next considered whether admission of the rebuttal evidence violated Petitioner's due process rights:

1
2
3
4
5

The relevance determination, however, does not end our inquiry. The Due Process Clause constrains admission of rebuttal evidence and requires that unduly prejudicial evidence be excluded if it makes the proceeding "fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The Supreme Court has said that establishing a denial of due process in a criminal trial requires a finding "that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial." *Lisenba v. California*, 314 U.S. 219, 236 (1941).

6
7
8
9
10
11

Although trial courts "should exclude [rebuttal] evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial," none of the testimony about which Smith complains rendered his sentencing proceedings fundamentally unfair. The superior court carefully assessed and scrutinized the prejudicial nature of the rebuttal evidence. The court limited the scope of the rape victim's testimony in the Lee sentencing proceeding based on the mitigation evidence that was presented and also limited the bad acts testimony that could be presented. Given the relevance to Smith's mitigation, the limits imposed by the trial court, and the deference given prejudice assessments, we conclude that no violation of Smith's due process rights occurred.

12   *Id.* at 232–33, 159 P.3d at 542–43 (citations and footnote omitted).

13   This decision was neither contrary to nor an unreasonable application of clearly

14   established federal law. "[J]ust as the defendant has the right to introduce any sort of relevant

15   mitigating evidence, the State is entitled to rebut that evidence with proof of its own."

16   *Dawson v. Delaware*, 503 U.S. 159, 167 (1992) (citing *Payne*, 501 U.S. at 825). "What is

17   important . . . is an *individualized* determination on the basis of the character of the individual

18   and the circumstances of the crime." *Barclay v. Florida*, 463 U.S. 939, 958 (1983) (quoting

19   *Zant v. Stephens*, 462 U.S. 862, 879 (1983)).

20   The State was entitled to present evidence rebutting Petitioner's mitigation evidence.

21   The rebuttal evidence was directly relevant to the opinions of Petitioner's mental health

22   expert, who testified that the murders were a result of Petitioner's sexual sadism and

23   committed impulsively while he was in a dissociative state. Evidence about the

24   circumstances of Petitioner's previous crimes, which Drs. Parrish and Moran also reviewed

25   in reaching their diagnoses, assisted the jury in evaluating the expert testimony. Given its

26   direct relevance to Petitioner's case in mitigation, the State's rebuttal evidence did not render

27   the sentencing unfair. *Cf. United States v. Gabrion*, 648 F.3d 307, 341 (6th Cir. 2011), *aff'd*

28

- 56 -

*en banc*, 719 F.3d 511 (6th Cir. 2013) (finding that a psychiatrist's testimony about defendant's history of violence toward women and animals was not outside the scope or prejudicial where it was offered to rebut mitigation evidence from mental health experts that downplayed defendant's dangerousness).

Petitioner also alleges an *ex post facto* violation, arguing that under the statute in place at the time of his original sentencing, A.R.S. § 13-454(B), the parties were permitted to present only mitigation evidence and rebuttal mitigation evidence. Petitioner asserts that the trial court, in applying A.R.S. § 13-703.01(G), the statute in effect at the time of 2004 resentencing, allowed the prosecution to present evidence that exceeded the scope of rebuttal and was "tantamount to the state offering non-statutory aggravating circumstances."(Doc. 25 at 96.)

Petitioner's counsel at resentencing argued that application of the new statute resulted in an *ex post facto* violation. The court rejected the argument, explaining that "[t]he new death penalty sentencing scheme merely clarifies and does not change the standard for admitting rebuttal evidence that was applicable when the defendant was last sentenced in 1979" and concluding that "because the new statutes merely implement new sentencing procedures and do not make any substantive change in the existing law, they do not violate either the federal or state Ex Post Facto clauses." (ROA 865 at 12.)

Petitioner did not raise this issue on appeal. The Court need not address Petitioner's argument that his default of the claim is excused under *Martinez*. The claim is plainly meritless.

The *Ex Post Facto* Clause provides that "no State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The Clause prohibits the legislative enactment of any law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648 (1798)).

The *Ex Post Facto* Clause does not apply to procedural changes. *See Dobbert v.*

1   *Florida*, 432 U.S. 282, 293 (1977) ("Even though it may work to the disadvantage of a

2   defendant, a procedural change is not *ex post facto.*"). To implicate the *Ex Post Facto* Clause,

3   a change must affect "substantial personal rights," not just "modes of procedure which do

4   not affect matters of substance." *Id.* (quotation marks and citation omitted).

5          To the extent that the admission of the State's rebuttal evidence under § 13-703.01(G)

6   reflected any change in the Arizona death penalty statue, there was no *ex post facto* violation

7   because the change was "procedural." It "neither made criminal a theretofore innocent act,

8   nor aggravated a crime previously committed, nor provided greater punishment, nor changed

9   the proof necessary to convict." *Dobbert*, 432 U.S. at 293; *see Gentry v. Sinclair*, 705 F.3d

10  884, 909–10 (9th Cir. 2013) (explaining that an *ex post facto* problem does not arise for a law

11  that does nothing more than admit evidence of a particular kind in a criminal case that was

12  not admissible under the rules of evidence at the time the offense was committed). Nor was

13  there was no change in the quantum of evidence necessary to sentence Petitioner to death.

14  *See Carmell v. Texas*, 529 U.S. 513, 546 (2000) ("The issue of the admissibility of evidence

15  is simply different from the question whether the properly admitted evidence is sufficient to

16  convict the defendant.").

17         Claim 23 is denied.

18         **Claim 29–30, 32–38**

19         On appeal Petitioner summarily raised a series of constitutional challenges to

20  Arizona's death penalty scheme. *Smith IV*, 215 Ariz. at 235–36, 159 P.3d at 545–46. The

21  Arizona Supreme Court's rejection of these claims, *id.*, was neither contrary to nor an

22  unreasonable application of clearly established federal law.

23

24         **Claim 29**

25         Petitioner alleges that his right to be free from cruel and unusual punishment would

26  be violated if the State of Arizona were to execute him after 35 years on death row. (Doc. 25

27  at 120.) The United States Supreme Court has never held that lengthy incarceration prior to

28  execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045

1   (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim

2   has not been addressed); *Thompson v. McNeil,* 556 U.S. 1114 (2009) (mem.) (Stevens, J. &

3   Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey*

4   issue). Circuit courts, including the Ninth Circuit, have also held that prolonged incarceration

5   under a sentence of death does not violate the Eighth Amendment. *See McKenzie v. Day*, 57

6   F.3d 1493, 1493–94 (9th Cir. 1995) (en banc); *White v. Johnson,* 79 F.3d 432, 438 (5th Cir.

7   1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). Claim 29 is denied.

8       **Claim 30**

9       Petitioner alleges that Arizona's "heinous, cruel, or depraved" aggravating

10  circumstance does not genuinely narrow the class of death-eligible offenders. (Doc. 25 at

11  122.) Rulings of both the Ninth Circuit and the United States Supreme Court have upheld

12  Arizona's death penalty statute against allegations that particular aggravating factors,

13  including the former § 13-454(E)(6) factor, do not adequately narrow the sentencer's

14  discretion. *See Jeffers*, 497 U.S. at 774–77; *Walton v. Arizona*, 497 U.S. 639, 652–56 (1990),

15  *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Claim 30 is denied.

16      **Claim 32**

17      Petitioner alleges that the death penalty is categorically cruel and unusual punishment.

18  (Doc. 25 at 128.) The Supreme Court has held otherwise. *Gregg v. Georgia,* 428 U.S. 153,

19  187 (1976). Claim 32 is denied.

20      **Claim 33**

21      Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and

22  Fourteenth Amendments because it requires a defendant to affirmatively prove that the court

23  should spare his life. (Doc. 25 at 129.) The Supreme Court has rejected the argument that

24  "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the

25  Constitution." *Walton*, 497 U.S. at 651. Claim 33 is denied.

26      **Claim 34**

27      Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and

28

- 59 -

1  Fourteenth Amendments because it requires a death sentence whenever an aggravating
2  circumstance and no mitigating circumstances are found with respect to an eligible
3  defendant. (Doc. 25 at 130.) The Supreme Court has rejected the claim that Arizona's death
4  penalty statute is impermissibly mandatory and creates a presumption in favor of the death
5  penalty. *Walton*, 497 at 651–52; *see also Kansas v. Marsh,* 548 U.S. 163, 173–74 (2006).
6  Claim 34 is denied.

7      **Claim 35**

8      Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and
9  Fourteenth Amendments because it does not sufficiently channel the discretion of the
10 sentencing authority. (Doc. 25 at 131.) The Ninth Circuit has rejected the contention that
11 Arizona's death penalty statute is unconstitutional because it "does not properly narrow the
12 class of death penalty recipients." *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).
13 Claim 35 is denied.

14     **Claim 36**

15     Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth
16 Amendment because it denies capital defendants the benefit of proportionality review. (Doc.
17 25 at 32.) There is no federal constitutional right to proportionality review of a death
18 sentence. *McCleskey*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43–44
19 (1984)). The Ninth Circuit has explained that the interest implicated by proportionality
20 review—the "substantive right to be free from a disproportionate sentence"—is protected by
21 the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97
22 F.3d 1246, 1252 (9th Cir. 1996). Claim 36 is denied.

24     **Claim 37**

25     Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and
26 Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the
27 death penalty. (Doc. 25 at 134.) Prosecutors have wide discretion in making the decision
28 whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296–97; *Gregg*, 428 U.S. at

199 (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). The Ninth Circuit has rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." *Smith*, 140 F.3d at 1272. Claim 37 is denied.

**Claim 38**

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. (Doc. 25 at 135.) The Supreme Court has held that a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994). Claim 38 is denied.

## III.   INEFFECTIVE ASSISTANCE: MITIGATION EVIDENCE

**Claim 39**

Petitioner alleges that counsel rendered ineffective assistance at resentencing by failing to adequately investigate, develop, and present mitigating evidence. (Doc. 25 at 136.) Petitioner specifically faults counsel for failing to obtain a PET (Positron Emission Topography) scan of Petitioner's brain, which would have shown brain injury. (*Id.* at 139.) Petitioner did not raise this claim in state court. As previously noted, he requests expansion of the record and an evidentiary hearing to address his claim that PCR counsel's deficient performance can excuse the procedural default of the claim. (Doc. 42.)

Background

As described above, the Ninth Circuit determined that trial counsel performed ineffectively during Petitioner's resentencing in 1979. *Smith III*, 189 F.3d 1004. The court noted that counsel failed to offer mitigating evidence of Petitioner's asthmatic condition, multiple personalities, and family background. *Id.* at 1009–10. The court particularly noted that expert evidence to the effect that Petitioner "lost contact with reality during his violent

outbursts, which were themselves a result of psychological tension built up between the two sides of his split personality" could have convinced a sentencer to exercise leniency. *Id.* at 1014.

Counsel at Petitioner's 2004 resentencings presented evidence addressing each of the issues noted in *Smith III*. The evidence and arguments focused on Petitioner's mental health and family background, as well as his good conduct in prison and lack of future dangerousness.

Counsel called nine mitigation witnesses in the Spencer resentencing, including Dr. Parrish, a neuropsychologist who testified about Petitioner's mental health and brain function; Petitioner's mother and sister, who testified about the family dynamics, including Petitioner's relationship with his father, as well as Petitioner's struggles with asthma and his social isolation; three corrections officers and James Aiken, an expert on correctional facilities and the classification of inmates, who testified about Petitioner's positive adaptation to life in prison; and an attorney and a family friend, both of whom witnessed Petitioner's "split personalities" while he was incarcerated following the murders. Dr. Parrish, the corrections officers, and Petitioner's mother and sister offered similar testimony during the Lee resentencing. Nonetheless, the jury in each case, after finding that three aggravating factors had been proved, determined that Petitioner should be sentenced to death.

While PCR counsel did not raise a claim of ineffective assistance based on resentencing counsel's failure to present mitigating evidence, he did argue that newly-discovered evidence would probably have changed the sentence. (Doc. 30-2, Ex. B, PCR petition at 21.) This evidence consisted of a PET scan and DTI (Diffusion Tensor Imaging) scan, administered by Dr. Joseph Wu in 2010 and 2011, that showed organic brain damage consistent with head trauma. (*Id.*, PCR petition, exhibits A–C.) In addition, Dr. Francisco Gomez, a neuropsychologist, performed a forensic psychological evaluation, which took into account the evidence of brain injury. (*Id.*, PCR petition exhibit D.) The PCR court denied the claim, finding that the new evidence was "cumulative" to that already presented at

1  sentencing. (Doc. 30-2,  Ex. C  at 6.)

2      Analysis

3      To prevail on a claim of ineffective assistance of counsel, a petitioner must show that

4  counsel's representation fell below an objective standard of reasonableness and that the

5  deficiency prejudiced the defense. *Strickland*, 466 at 687–88. The inquiry under *Strickland*

6  is highly deferential, and "every effort [must] be made to eliminate the distorting effects of

7  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

8  the conduct from counsel's perspective at the time." *Id.* at 689. To this end, reviewing courts

9  "must indulge a strong presumption" that counsel "rendered adequate assistance and made

10 all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90.

11     Counsel has a duty to make reasonable investigations or to make a reasonable decision

12 that makes particular investigations unnecessary. *Id.* at 691. However, there is no "set of

13 detailed rules for counsel's conduct" and "a particular decision not to investigate must be

14 directly assessed for reasonableness in all the circumstances, applying a heavy measure of

15 deference to counsel's judgments." *Id.* at 688–90; *see also Pinholster*, 131 S. Ct. at 1406–07

16 (noting that *Strickland* "rejected the notion that the same investigation will be required in

17 every case").

18

19     To demonstrate prejudice, a petitioner "must show that there is a reasonable

20 probability that, but for counsel's unprofessional errors, the result of the proceeding would

21 have been different." *Id.* at 694. When challenging a death sentence, "the question is whether

22 there is a reasonable probability that, absent the errors, the sentencer . . . would have

23 concluded that the balance of aggravating and mitigating circumstances did not warrant

24 death." *Strickland*, 466 U.S. at 695. In determining whether there is a reasonable probability

25 of a different result, a reviewing court "reweigh[s] the evidence in aggravation against the

26 totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The

27 "totality of the available evidence" includes "both that adduced at trial, and the evidence

28 adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362,

397–98 (2000)); *see Schurz v. Ryan*, 730 F.3d 812, 816 (9th Cir. 2013).

Applying these standards, the Court concludes that counsel's performance at resentencing was neither deficient nor prejudicial.

*No deficient performance*

Counsel did not perform deficiently by failing to secure a PET scan or DTI scan. Prior to his 2004 resentencing proceedings, Petitioner had been examined by at least 10 mental health professionals: Drs. Chalise, Melendez, Tucher, Bendheim, Gray, Hoogerbeets, Garcia-Bunuel, Cleary, Goldberg, and Tatro. (ROA 803, Ex's A–K.) In 1977, Dr. Garcia-Bunuel ordered an EEC, a CBF (cerebral blood flow), a brain scan, and a complete battery of psychological tests. (*Id.*, Ex. H.) The results were negative for "any cerebral or inter-cranial pathology." (*Id.*, Ex. K.) None of the other experts suggested that Petitioner suffered from organic brain impairment or a neurological disorder. (*Id.*, Ex's A–K; *see* RT 4/12/04 at 39; RT 5/20/04 at 152; RT 5/24/04 at 13.)

For the 2004 resentencing proceedings counsel retained Dr. Susan Parrish, a neuropsychologist with more than 25 years of experience, who testified at both the Spencer and Lee resentencings. Dr. Parrish performed a neuropsychological examination of Petitioner and diagnosed him with mild to moderate brain impairment. (*See* RT 4/12/04 at 40, 56.) She testified, as did Petitioner's mother, that Petitioner suffered a head injury in car accident when he was infant. (RT 4/8/04 at 68–70; RT 4/12/04 at 46–47; RT 5/24/04 at 56, 57.)

Dr. Parrish also testified that Petitioner suffered from dissociative identity disorder and was in an "altered state," acting impulsively and without control, when he committed the murders. (*See* RT 4/14/04 at 42, 45, 50; RT 5/24/04 at 30.) She testified that dissociation is a "breakdown in the integration of memory, consciousness, perception, thinking." (RT 4/12/04 at 14.) Multiple personality disorder is the most extreme form of dissociation. (*Id.*) Because the failure to present such "split personality" evidence was the principal basis on which the Ninth Circuit found prior counsel ineffective, *Smith III*, 189 F.3d at 1014, counsel performed reasonably in securing Dr. Parrish's testimony at the 2004 resentencing.

Dr. Parrish's testimony also addressed Petitioner's upbringing, including the physical and psychological effects of his severe asthma, which led to anxiety and social isolation and may have contributed to his impaired brain function and dissociative identity disorder. (*See* RT 4/14/04 at 14–20; RT 5/20/04 at 110–16.) She testified about Petitioner's relationship with his father, who was emotionally distant and physically abused him on one occasion, and with his over-protective mother. (*Id.* at 20–29.) She testified that Petitioner did not have an anti-social personality. (*See* RT 4/12/04 at 163–67.) She noted that he was able to feel empathy; he cared about animals and people, and maintained a close relationship with his mother. (*Id.* at 167.) Again, the absence of such evidence about Petitioner's background factored into the Ninth Circuit's ruling that prior counsel performed ineffectively. *Smith III*, 189 F.3d at 1109–10. Counsel reasonably sought to address these issues by presenting Dr. Parrish's testimony.

Dr. Parrish testified that the neuropsychological examination she performed, the Halstead-Reitan Battery,[18] is a more sensitive instrument for identifying brain impairment than CAT scans or MRIs, explaining that "you can have neuropsych impairment and have nothing show up on a CAT scan, or an MRI, for that matter." (RT 4/12/04 at 40; *see* RT 4/15/04 at 53–54.) If Dr. Parrish was incorrect in her assessment of the relative value of neuropsychological tests versus brain scans, her error does not reflect a failure on counsel's part. *See Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (explaining that an "expert's failure to diagnose a mental condition does not constitute ineffective assistance of counsel, and [a petitioner] has no constitutional guarantee of effective assistance of experts"); *see also Richter*, 131 S. Ct. at 789 ("There were any number of experts whose insight might have been useful to the defense. Counsel is entitled to balance limited resources in accord with effective trial tactics and strategies.").

Finally, Dr. Parrish testified that she agreed with the State's expert, Dr. Moran, who

---

[18] Dr. Parrish studied under Ralph Reitan, who developed the Halstead-Reitan Battery. (*See* RT 4/12/04 at 8.)

diagnosed Petitioner as a sexual sadist. Dr. Parrish explained that this condition, combined with Petitioner's brain impairment and dissociative disorder, caused Petitioner to commit the murders. (*See* RT 4/14/04 at 45; RT 5/20/04 at 103, 120, 131–32.)

Counsel's performance was reasonable. The failure to obtain more-sophisticated tests such as a PET scan did not constitute deficient performance based on the information available to counsel from prior mental health examinations, the new information provided by Dr. Parrish, and the wide range of other mitigating evidence counsel pursued and presented. For the same reasons counsel's performance did not prejudice Petitioner.

*No prejudice*

Petitioner was not prejudiced by counsel's failure to secure a PET scan or DTI because the information resulting from those tests duplicates the evidence counsel presented at sentencing. The PCR court considered the new evidence and found it cumulative:

> At the penalty phases Defendant presented evidence of brain impairment through his expert, Dr. Parrish. His mother also testified that he suffered a head injury as a baby. Thus, although the PET scan confirms the frontal lobe injury, it is cumulative. Dr. Parrish opined that Defendant suffered from sexual sadism and that he was unable to control his actions at the time of the murders.

> Defendant's new expert, Dr. Gomez, notes in his report that the PET scan is consistent with Dr. Parrish's neuropsychological examination. He agrees that Defendant suffers from sexual sadism and further opines that it is likely Defendant is unable to control his impulses because of his brain impairment. Thus, Defendant's proposed new evidence is similar to Dr. Parrish's testimony and therefore cumulative.

(Doc. 30-2, Ex. C at 6.)

Petitioner was not prejudiced by PCR counsel's failure to raise an argument predicated on a claim that the PCR court considered and rejected. Similarly, resentencing counsel's failure to secure a PET scan did not prejudice Petitioner.

Dr. Wu reviewed the PET scan and DTI of Petitioner brain's and found a pattern consistent with a history of head trauma as a child. (Doc. 30-2, Ex. B, PCR petition, exhibit B.) Specifically, he identified impairment in Petitioner's frontal lobes. (*Id.*) Dr. Wu explained that "[t]he abnormalities noted on the PET scan are also consistent with the

neuropsychological testing deficits noted by Dr. Parrish such as impairment on the Halstead Reitan Neuropsychological Test Battery." (*Id.*, PCR petition, exhibit C at 5.)

Dr. Gomez reviewed Dr. Wu's report and conducted a neuropsychological examination. (*Id.*, PCR petition, exhibit D.) He explained that "impairment of frontal lobes diminishes an individual's ability to control their behavior under conditions of duress." (*Id.* at 12.) The remainder of Dr. Gomez's conclusions are not meaningfully distinguishable from the opinions offered by Dr. Parrish.

Dr. Gomez opined that "it appears that Mr. Smith has neurocognitive impairments that affect his ability to regulate his impulses and/or aggression" and that "Mr. Smith has a psychosexual disorder that coupled with neurocognitive impairment decreases his ability to inhibit his deviant behavior." (*Id.*) Dr. Parrish testified that Petitioner suffered from neurological impairment and sexual sadism as well as anxiety and dissociative identity disorder. (*See* RT 4/12/04 at 40–45, 55, 148, 161; 4/14/04 at 36–49; RT 5/20/04 at 75, 131–32.) These conditions resulted in "diminished control over his behavior." (RT 5/20/04 at 132; *see* RT 4/14/04 at 45.) Dr. Parrish also discussed the frontal lobe as the "center of executive control" and further testified that because "the brain is responsible for impulse control . . . when you have brain impairment, oftentimes you have disinhibitive behavior, impulsive behavior." (RT 5/20/04 at 83, 84.)

To assess whether there is a reasonable probability of a different result, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence, including the evidence produced in subsequent proceedings, *Wiggins*, 539 U.S. at 534, 536, which, in this case, consists of the findings of Drs. Wu and Gomez.

 The difference between what was presented at sentencing and what Petitioner now contends should have been presented constitutes little more than a better-defined explanation of the origin of Petitioner's brain impairment. Petitioner emphasizes the fact that Dr. Parrish could not accurately date the onset of his impairment. She did testify, however, that Petitioner committed the murders while acting out of impulses which his mental condition,

including his sexual sadism, left him unable to control. Moreover, Dr. Parrish's testimony did not exclude the possibility that brain damage was present and, along with his anxiety, dissociative disorder, and sexual sadism, contributed to his lack of control at the time of the murders.

The findings of Drs. Wu and Gomez do not offer a new or more mitigating explanation of the effects of Petitioner's neurological and mental status at the time of the crimes, and there is not a reasonable probability that placing a different emphasis on the cause of his impulsive behavior would have persuaded the jury to vote for a life sentence. *See Forrest v. Steele*, No. 09-8002-CV-W-ODS, 2012 WL 1668358, at * 4 (W.D. Mo. May 12, 2012) ("The PET scan would have confirmed the experts' testimony, but would not have added anything to it."); *Walls v. McNeil*, No. 3:06cv237/MCR, 2009 WL 3187066, at *32–33 (N.D. Fla. Sept. 30, 2009) (denying ineffective claim based on failure to conduct PET scan where "any results that the PET scan might have revealed were already presented to the jury by the defense experts," including testimony suggesting that defendant had "significant neuropsychological deficits"). In sum, the PET scan evidence "would have barely altered the sentencing profile presented" to the jury. *Strickland,* 466 U.S. at 699–700; *see Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009) ("We hold that the absence of evidence that was cumulative of what had already been presented and that was speculative in nature does not undermine our confidence in the outcome of Bible's sentencing hearing.").

Balanced against this slightly revised picture of Petitioner's neurological status are the aggravating factors found by the jury, which could not be weightier or more severe. There is little likelihood that the additional evidence cited by Petitioner would have resulted in a different verdict. *See Samayoa v. Ayers*, 649 F.3d 919, 929 (9th Cir. 2011) (finding no prejudice from failure to present additional mitigation where the crimes and petitioner's propr record were "brutal and horrific"); *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011) ("Given the exceptional depravity of this murder, it is unlikely that additional evidence of a brain abnormality would have made a difference."); *Bible*, 571 F.3d at 872 (finding no

prejudice where the "significant amount of aggravating circumstances" consisted of the especially cruel murder of a 9-year-old child).

Thirty-eight years ago, Petitioner "committed two crimes of unspeakable cruelty and brutality." *Smith III*, 189 F.3d at 1014 (Fernandez, J., dissenting). Fifteen years ago a panel of the Ninth Circuit granted habeas relief on Petitioner's claim that counsel performed ineffectively at his 1979 resentencing. The panel concluded that "we cannot say with any confidence that information about the split nature of Smith's personality would not have led a sentencing judge to conclude that Smith was not deserving of the death penalty." *Id.* That evidence, and much more, has now been presented, and the juries that heard it determined that death was the appropriate sentence.

Neither resentencing counsel nor PCR counsel performed at a constitutionally ineffective level. Claim 39 is denied.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant cannot take an appeal unless a certificate of appealability ("COA") has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983)).

The Court finds that Claims 13 and 23 are adequate to deserve encouragement to proceed further or are debatable by reasonable jurists. The Court finds, for the reasons set out

1   in this Order, that the dismissal of the remainder of Petitioner's claims is not debatable

2   among reasonable jurists, and none of the claims deserves encouragement to proceed further.

3   Accordingly, the Court declines to issue a COA on any of these issues.

**CONCLUSION**

4

5   The Court has carefully reviewed the entire record, including the materials with which

6   Petitioner seeks to expand the record, to determine whether Petitioner is entitled to

7   evidentiary development or habeas relief. He is not.

8   Petitioner's allegations of ineffective assistance of trial and appellate counsel are not

9   "substantial" under *Martinez* and do not serve as cause for default of the claims for which

10  Petitioner requests evidentiary development. Petitioner's exhausted claims do not entitle him

11  to habeas relief under 28 U.S.C. § 2254(d)(1) or (2).

12  Accordingly,

13  IT IS HEREBY ORDERED granting in part Petitioner's motion for evidentiary

14  development (Doc. 42). The record will be expanded to include the transcript of the

15  September 10, 2004 hearing (Doc. 42-1, Ex. A). The remainder of the motion is denied.

16

17  IT IS FURTHER ORDERED that Petitioner's Petition for Writ of Habeas Corpus

18  (Doc. 25) is denied. The Clerk of Court shall enter judgment accordingly.

19  IT IS FURTHER ORDERED granting a Certificate of Appealabilty with respect to

20  Claims 13 and 23.

21  DATED this 24th day of March, 2014.

22

23

24  Paul G. Rosenblatt
    United States District Judge

25

26

27

28